**UNITED STATES of America,
Appellant,**

v.

**Mark Lewis SINGER, Appellee.**

**No. 84–5156.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 16, 1985.

Decided Feb. 26, 1986.

Rehearing and Rehearing En Banc
Denied May 20, 1986.

Ronald I. Meshbesher, Minneapolis, Minn., for appellant.

Frank Noel, Asst. U.S. Atty., Minneapolis, Minn., for appellee.

Before BRIGHT,* ROSS and JOHN R. GIBSON, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Mark Lewis Singer again appeals after a second jury trial from a conviction of conspiracy to possess and distribute marijuana

---

* The Honorable Myron H. Bright was United States Circuit Judge of the Eighth Circuit at the time this case was submitted. He took Senior status on June 1, 1985, before this opinion was filed.

in interstate commerce, in violation of 18 U.S.C. § 371 (1982), and attempt to distribute marijuana and to aid and abet in the attempt to distribute marijuana, in violation of 21 U.S.C. § 846 (1982) and 18 U.S.C. § 2 (1982). Singer challenges the conviction on five grounds. He argues principally that the prosecution's acquisition and review of his attorney's trial strategy file, and subsequent prejudicial statements to the press, resulted in a denial of his sixth amendment right to effective assistance of counsel. He also contends that the fifth amendment protection against double jeopardy should have precluded his retrial when his first conviction was reversed on the basis of judicial misconduct. He seeks dismissal of the indictment, or alternatively, reversal of the conviction and a new trial. We affirm the judgment of conviction.

Singer initially was tried and convicted in a jury trial concluding on December 18, 1980, before Judge Miles W. Lord.[1] The conviction was affirmed by a divided panel, *United States v. Singer*, 687 F.2d 1135 (8th Cir.1982), but reversed on the basis of judicial misconduct by this court en banc, *United States v. Singer*, 710 F.2d 431 (8th Cir. 1983). This court concluded that Judge Lord's conduct "fell below the Plimsoll line of fairness and the appearance of fairness," *id.* at 437 (footnotes omitted), and thus "prevented the defendants from having their guilt or innocence determined in a proceeding free of the fatal appearance of unfairness." *Id.* at 432.[2]

Retrial was set for September 14, 1983, before Judge Diana E. Murphy.[3] Five days before trial, the United States Attorney delivered to Singer's counsel, Ronald I. Meshbesher, a letter enclosing materials that he stated "came into possession of the United States from a non-government

source." Appellant's Addendum at 2. The materials were copies of 56 documents from Meshbesher's attorney-client file relating to his representation of Singer. Singer moved immediately to dismiss the indictment for prosecutorial misconduct.

At the motion hearing, Assistant United States Attorney Daniel W. Schermer, who had tried the government's case against Singer, testified that the confidential documents were obtained two years after Singer's conviction by Minneapolis Police Sergeant Ronald Johnson. The source was Marshall Stoll, an indicted co-conspirator of Singer who was a fugitive at the time of the first trial, who in turn had received them from a third person. Schermer further stated that Stoll, before delivering the documents, claimed that they provided proof that perjury had been committed at trial. During the opening days of the motion hearing, reports appeared in the news media quoting the Minneapolis Chief of Police and Judge Lord, then Chief Judge, that the contents of the confidential file showed that Gilbert Singer, the defendant's father, had at trial committed perjury and had done so with Meshbesher's approval. Similar statements issued from the United States Attorney's office. Then, on September 20, 1983, Judge Lord sent a letter to Judge Murphy stating that "it has been my experience that defense counsel in criminal cases are much more interested in questions than in answers," Appellant's Addendum at 26, and offering to testify in the *Singer* matter. Schermer also testified at the hearing that between the time of Singer's conviction and his filing of post-trial motions, Judge Lord had initiated an *ex parte* meeting with Schermer to express his concern over the adequacy of the trial

---

1. The Honorable Miles W. Lord was United States District Judge for the District of Minnesota at the time this case first was tried. He retired under 28 U.S.C. § 371(a) on September 11, 1985.

2. Defense counsel had moved on 15 occasions during trial for mistrial based on Judge Lord's conduct. *United States v. Singer*, 710 F.2d at 434 n. 2. After this court's reversal of the conviction, Judge Lord reacted, as quoted in the

*Minneapolis Star and Tribune:* "It's up to the judge to see that a fair trial results. People shouldn't be found innocent because of a disparity of their representations." Appellant's Addendum at 1.

3. The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota.

record. According to Schermer, Judge Lord urged the government to provide additional documentation to avoid reversal on appeal.

Based on the statements and conduct of Judge Lord, the United States Attorney's office, and police officials, Singer moved to enlarge the basis of his motion to dismiss the indictment to encompass governmental misconduct. He further moved for Judge Murphy's recusal because of her position as judge in the district in which Judge Lord was chief judge. Finally, because he believed that the newspaper statements and the possibility of prosecution for subornation of perjury would chill his ability to zealously represent Singer, Meshbesher requested the court's permission to withdraw from the case. Singer consented to Meshbesher's withdrawal as trial counsel, provided that Meshbesher continue to represent him on the motion to dismiss the indictment. Judge Murphy granted the request.

On September 27, 1983, Judge Murphy recused herself from presiding over the hearing on the motion to dismiss the indictment. Chief Judge Lay of this court then designated Judge G. Thomas Eisele[4] of Arkansas to rule on Singer's motion to dismiss.

**Hearings Before Judge Eisele**

Judge Eisele conducted hearings in November and December, and on December 21, 1983, issued oral Findings of Fact and Conclusions of Law.[5] Judge Eisele found that misconduct had occurred when government officials obtained the confidential attorney-client file, and again when they made prejudicial statements to the press. As a result, Singer's sixth amendment right to counsel had been violated. He concluded, however, that the violation did not warrant dismissal of the indictment. Rather, Judge Eisele fashioned remedies to remove on retrial any prejudice to the defendant that might result from the govern-

mental misconduct and the resulting constitutional violation. Judge Eisele also found that Judge Lord had indeed initiated at least one *ex parte* contact with the prosecuting attorney, and concluded that the contact was improper. He concluded, however, that Judge Lord's various acts of misconduct neither would prejudice Singer on retrial nor did they demonstrate the intent to prejudice Singer required to raise a valid double jeopardy concern. Therefore, the motion to dismiss was denied.

Judge Eisele first considered the circumstances under which the government received Meshbesher's attorney-client file. Immediately before or at the time of trial in December 1980, he found, an employee in Meshbesher's law office who in no way was connected with the government or with any law enforcement agency photocopied the confidential file. Marshall Stoll, the indicted co-conspirator fugitive-turned-informant, obtained the file no later than spring 1981. Judge Eisele, to protect Stoll's fifth amendment right against self-incrimination, did not require Stoll to disclose how or from whom he had obtained the file. Stoll surrendered, pleaded guilty, and agreed to cooperate on August 19, 1982.

Judge Eisele found further that around October 1, 1982, Stoll, pursuant to the plea agreement, met with Sergeant Johnson. Both Johnson and Assistant United States Attorney Schermer already had suspected that Gilbert Singer had testified falsely. Johnson gave Stoll a transcript of Gilbert Singer's trial testimony. Stoll confirmed the government officials' suspicions. Stoll then told Johnson that he had copies of documents from the Meshbesher file, which he would supply, that could in part prove that Gilbert Singer had lied. Johnson relayed Stoll's assertion and offer to Schermer. Stoll later repeated his assertion and offer directly to Schermer. Judge Eisele found that Schermer, after examining the

---

**4.** The Honorable G. Thomas Eisele, Chief Judge of the United States District Court for the Eastern District of Arkansas, sitting by designation.

**5.** Judge Eisele orally entered findings and conclusions throughout the hearing, and incorporated them by reference into the ruling of December 21.

law, believed in good faith that the government properly could accept and examine the file. Johnson thus received the file from Stoll.

Judge Eisele, reviewing the law, agreed that the government properly may receive confidential documents if it plays no role in their wrongful procurement and if it has probable cause to believe they constitute proof of criminal activity. However, he continued, the government also must conscientiously endeavor to obtain no more documents than support the representations of wrongdoing. Stoll's representations, the Judge found, combined with the government agents' suspicions, created probable cause to permit a limited examination of the file. The Judge also found, however, that the government had made no effort to have Stoll select only the documents that substantiated his allegation, but actively encouraged him to turn over the entire file. Thus, Judge Eisele concluded, because the government did not undertake to obtain only the relevant materials, and in fact had reviewed defendant's confidential trial strategy files irrelevant to Stoll's allegation of the collateral crimes, it had knowingly intruded, though in good faith, into the attorney-client relationship. Since the intrusion threatened to prejudice defendant on retrial, the government had violated Singer's sixth amendment right to effective representation of counsel.

Judge Eisele observed, nevertheless, that the sixth amendment violation did not warrant dismissal of the indictment. Rather, he looked to *United States v. Morrison,* 449 U.S. 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), which holds that in cases of sixth amendment violations, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 668, 101 S.Ct. at 668 (footnote omitted). He reasoned that under *Morrison* the proper course was to tailor a remedy that would neutralize the threat to remove upon retrial any possibility of prejudice to the defendant as a result of the governmental misconduct. There-

fore, Judge Eisele denied defendants' motion to dismiss the indictment.

Judge Eisele proceeded to fashion a remedy which he concluded would effectively insulate Singer on retrial from the taint of the constitutional violation. Judge Eisele ordered that: (1) the government return all documents from the file except those which it specifically represented contained evidence of perjury by Gilbert Singer or subornation of perjury by Meshbesher; (2) no government attorney with any knowledge of the contents of the documents would be permitted to participate in the retrial of the case; and (3) no law enforcement officer with any knowledge of the contents of the documents would be permitted to use or mention them while working on the case with the attorney assigned to retry the case. Judge Eisele, however, did not prohibit Johnson from continuing to work on the case. Nor did he prohibit either Johnson or Stoll from testifying on retrial.

Judge Eisele then turned to defendant's contention that government officials had publicized their procurement of the confidential file, which they suggested constituted proof of perjury by Gilbert Singer and subornation of perjury by Meshbesher, to disrupt the Meshbesher-Singer attorney-client relationship. Such publicity, Singer asserted, resulted in a violation of his sixth amendment right to effective representation by the counsel of his choice. The Judge found that law enforcement officials involved in the prosecution of the case improperly leaked unproven assertions to the press which potentially compromised Meshbesher's effectiveness as an advocate. He also found that while there was no intent to prejudice defendant upon retrial or to interfere with the attorney-client relationship, the effect of such leaks was to threaten prejudice to Singer. He therefore acknowledged the existence of a sixth amendment deprivation. Nevertheless, Judge Eisele concluded that Meshbesher's continued representation of Singer was not untenable, that he was not compelled to withdraw. Again, relying on *United States v. Morrison,* the Judge concluded that a remedy less drastic than dismissal of the indict-

ment could properly be tailored. He reasoned that the passage of time or retrial in a different locale would serve adequately to dissipate any potential prejudice and allow Singer continued representation by his chosen counsel. He therefore permitted Singer to move for a continuance or change of venue. Singer declined to so timely move. Meshbesher maintained his withdrawal.

Finally, Judge Eisele considered whether Judge Lord's various acts of judicial misconduct warranted dismissal of the indictment. He found that Judge Lord improperly had initiated at least one *ex parte* contact with Schermer shortly after Singer's conviction in December 1980. He concluded, however, in view of this court's action granting a new trial before a different judge, that the taint of judicial misconduct had been removed. Further, relying on *United States v. DiFrancesco*, 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980), which holds that the double jeopardy clause does not bar retrial unless the conviction is reversed for insufficient evidence, Judge Eisele further concluded that even when combined with the earlier acts of misconduct which formed the basis of this court's reversal of Singer's first conviction, Judge Lord's conduct did not demonstrate an intent to prejudice. Judge Lord's conduct thus did not raise a valid double jeopardy concern to prevent the government from retrying Singer.

**Retrial Before Judge Murphy**

The case was returned to Judge Murphy for retrial. Pursuant to Judge Eisele's order, two Assistant United States Attorneys from the District of North Dakota, who had no prior involvement in the case, were assigned to prosecute. Johnson was replaced as case agent, although he continued to assist in the preparation of the case. Singer was represented by appointed counsel.

Before trial, Singer moved to disqualify Johnson and Stoll from serving as witnesses on grounds that they were familiar with the contents of the improperly obtained file. The motion was denied. At trial, Johnson testified principally to the events leading to the government's seizure of marijuana in Minneapolis. He also testified to his analysis of telephone and shipping records offered to implicate Singer in the conspiracy. Stoll testified extensively to his association with Singer, and to their specific acts and respective roles in the conspiracy. On cross-examination, he admitted to numerous past crimes and to his understanding that he likely would receive a reduced sentence in exchange for his testimony. Singer's counsel also sought to cross-examine Stoll regarding his acquisition of the Meshbesher file. Over objection, Stoll was permitted to invoke the fifth amendment privilege against self-incrimination. Singer then moved to strike Stoll's entire testimony. The motion was denied.

The government produced additional evidence of Singer's complicity in the conspiracy. A Miami police officer testified that he arrested Singer at an air freight office as Singer was delivering several hundred pounds of marijuana for shipment to Minneapolis and San Francisco. At that time Singer possessed a folder containing freight invoices later shown to be for marijuana shipments. On the folder was written an address of a Minneapolis warehouse where marijuana later was found. Additional invoices were found in Singer's billfold. Notes of earlier marijuana shipments, bookkeeping entries, and the names of co-conspirators were found written in Singer's personal calendar book. Two unindicted co-conspirators who entered plea agreements testified that they had met Singer in connection with the conspiracy and had been directed by him by phone to pick up marijuana shipments from Miami at an air freight office in Minneapolis. Testimony also was offered and sales receipts produced showing that Singer had purchased baling tools, used to package marijuana for shipment.

Singer produced evidence that, as a lawyer, he had done legitimate legal work for his co-conspirators, and that he had been drawn unwittingly by them into the conspiracy. Gilbert Singer did not testify.

After an eight-day trial, the jury returned a verdict of guilty. Singer was sentenced to two consecutive terms of five years' imprisonment, a total of ten years. This appeal followed.

### Issues

Singer challenges his conviction on five grounds. He argues that the indictment against him should be dismissed because the government's procurement and review of the confidential attorney-client file resulted in a denial of his sixth amendment right to effective assistance of counsel that Judge Eisele's remedial order failed to cure. He further asserts that the government officials' statements to the press suggesting that Meshbesher had knowingly obtained perjured testimony from Gilbert Singer disrupted the attorney-client relationship and forced Meshbesher's withdrawal, thus denying Singer his sixth amendment right to effective representation by his counsel of choice. In addition, Singer argues that the fifth amendment double jeopardy protection should have barred his retrial because his first conviction was reversed as a result of judicial misconduct which, subsequent proceedings revealed, was driven by an intent to prejudice his defense. He also contends that the court violated his sixth amendment right to confrontation by refusing to strike Stoll's testimony after he invoked the fifth amendment privilege against self-incrimination in response to cross-examination. Finally, Singer urges this court, because of the various demonstrated acts of repeated governmental misconduct, to exercise its supervisory authority over the administration of criminal justice, to dismiss the indictment.

### I.

Singer argues that the indictment against him should be dismissed because the government's procurement and review of the confidential attorney-client file resulted in a denial of his sixth amendment right to effective assistance of counsel that Judge Eisele's remedial order failed to cure.

▆ To establish a sixth amendment violation, a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant, *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1976); *United States v. Davis*, 646 F.2d 1298, 1303 (8th Cir.), *cert. denied*, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981), or created a substantial threat of prejudice. *See United States v. Morrison*, 449 U.S. at 366, 101 S.Ct. at 668–69.[6] Identification of a sixth amendment violation alone, however, does not require dismissal of the indictment. The interests supporting the sixth amendment right, meant to assure fairness in the adversary criminal process, *see, Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963), must be reconciled with society's competing interest in prosecuting criminal conduct. In *United States v. Morrison*, the Supreme Court held that despite the government's deliberate violation of defendant's sixth amendment rights, by disparaging her choice of counsel and by attempting to induce her to cooperate in the absence of counsel, the district court erred in dismissing the indictment. Rather, the appropriate course when faced with a sixth amendment violation is to tailor a remedy to the injury suffered, to assure the defendant effective assistance of counsel in a subsequent pro-

---

**6.** Singer urges that we apply the standard set out in *United States v. Davis*, 646 F.2d at 1303 n. 8, where we commented, "It is certainly true that where there is gross misconduct on the part of the government no prejudice need be shown." Judge Eisele specifically found that Schermer in good faith concluded that government receipt of the file from Stoll was not improper. There has been no showing that this finding is clearly erroneous. *United States v. Callery*, 774 F.2d 1456 (9th Cir.1985) (district court's determination as to good faith was a finding of fact not to be set aside unless clearly erroneous). Nevertheless, Singer's application of *Davis* really is beside the point, since Judge Eisele concluded that the sixth amendment in fact had been violated.

ceeding. *Accord United States v. Soloman*, 679 F.2d 1246 (8th Cir.1982).[7]

Judge Eisele found that a sixth amendment violation had occurred because the government's procurement and review of the attorney-client file threatened to create prejudice at retrial. The question presented, then, is whether his remedial order was effective in eliminating upon defendant's retrial any "demonstrable prejudice, or substantial threat thereof." *Morrison*, 449 U.S. at 366, 101 S.Ct. at 668–69.

■ Singer contends that Judge Eisele's order was flawed principally by its failure to bar Johnson and Stoll from testifying at retrial after they had seen the privileged documents. He points particularly to their review of Meshbesher's "witness list," a document listing 24 proposed witnesses with capsule summaries of their proposed testimonies. Appellant's Addendum at 29–30. Only three on the list had testified at the first trial, but 14 were called at retrial. Such review enabled Johnson and Stoll to anticipate defense witness testimony, he asserts. "It is not possible to purge their minds." Appellant's Brief at 38.

Singer, however, fails to specify any testimony that reflects familiarity with the file. While full disqualification of Johnson and Stoll from any participation was an option open to the district judge, we do not believe that this extraordinary measure was necessary to remove the threat of prejudice resulting from the sixth amendment violation. Thus, we are unable to conclude that Judge Eisele's remedial order failed to satisfy the standard set out in *Morrison*. Nor do we believe that on retrial the taint of the earlier sixth amendment deprivation actually persisted. We have studied the record of both trials and are unable to conclude that the retrial testimony of either Johnson or Stoll was influenced by their study of the confidential file so as to result in the defendant's suffering demonstrable prejudice.

Johnson first testified regarding his arrest of an indicted co-conspirator, who was found at a Minneapolis air freight office awaiting the arrival of a marijuana shipment that, a comparison of shipping invoices demonstrated, Singer had attempted to send from Miami. He also described the subsequent seizure of marijuana in a Minneapolis warehouse, detailing the packaging and condition of the contraband. Finally, Johnson testified to his analysis of telephone toll records, which demonstrated that numerous telephone calls had been placed from Singer's residence and Stoll's office in Miami to the residence of an admitted co-conspirator in Minneapolis. Johnson's testimony at the second trial was considerably less comprehensive than at the first trial. Nothing that hadn't previously been stated was added. We are thus unable to discern any way in which Johnson's retrial testimony may have been shaped by his review of the confidential file.

We similarly are unable to discern how Stoll's review of the file may have influenced his testimony. On direct examination, Stoll testified to his long-lived association with Singer and to the origins of the conspiracy to distribute marijuana. He testified that during the period from July 1977 to early 1978, marijuana regularly was shipped from Miami to Minneapolis. At first, the marijuana was shipped, accompanied by Stoll and Singer, by commercial passenger plane. As the enterprise developed, the marijuana was shipped by air freight, with Stoll and Singer travelling to Minneapolis one to three times weekly to collect and convey the proceeds, which Stoll testified ranged from $50,000 to $200,000 per trip. It is apparent that this testimony emanates not from review of the file, but from experience.

The government offered additional testimony and documentary evidence which substantially corroborated Singer's role in

---

7. The National Association of Criminal Defense Lawyers, in its brief as *Amicus Curiae*, argues that an exclusionary remedy is inadequate to protect a defendant after a violation of the sixth amendment right to effective assistance of counsel. *Amicus* presses that we adopt a rule that a sixth amendment violation should result in automatic dismissal of the indictment. Such a rule, obviously, is untenable after *United States v. Morrison*.

the conspiracy. Singer was arrested at a Miami air freight office in possession of several hundred pounds of marijuana. At that time he possessed numerous documents tying him to the conspiracy. In addition, other co-conspirators testified as to Singer's involvement.

We therefore are not convinced that Johnson and Stoll's review of the confidential attorney-client file influenced their testimony. Singer has failed to point us to any specific statement or area of testimony which reflects knowledge of the file. Our study of the record reveals none. Furthermore, it is doubtful, in light of Stoll's inculpatory admissions, that the jury placed significant weight on his testimony.[8] Finally, even if we were to completely discount the testimony of Johnson and Stoll, we believe the record makes plain that the government produced substantial additional evidence for a jury to reasonably find that Singer had indeed committed the crimes with which he was charged.[9]

Singer alleges other ways in which he was prejudiced by the government's procurement of the confidential file. He complains that information from the documents had been communicated to numerous persons, including the United States Attorney and numerous police officials. Accepting for argument sake this assertion as true, we fail to see how such officials' knowledge resulted in prejudice to Singer. In order to comply with Judge Eisele's order, none of these officials participated in the retrial. North Dakota prosecutors previously uninvolved were assigned to the case. Johnson was replaced as case agent. There is no evidence either that Singer

identifies or that we can find, that anyone, including Johnson or Stoll, ever communicated anything learned from review of the documents, let alone evidence that such communications caused prejudice. Singer's contention rests on unsupported speculation, and we therefore must reject it. We similarly dispose of Singer's complaint that Judge Murphy's review of the documents may have affected her rulings.

Singer finally charges that he was prejudiced because the government's examination of the documents and the subsequent suggestions of perjury and subornation of perjury prevented Gilbert Singer from testifying and resulted in Meshbesher's withdrawal as trial counsel. These assertions are without merit. As to Gilbert Singer, baseless accusations, as they are characterized by Singer, logically pose no threat to truthful testimony. As to the attorney withdrawal, Judge Eisele properly concluded that Meshbesher's continued representation of Singer was not untenable. Furthermore, even if government officials' statements to the press did create in Meshbesher a conflict of interest requiring withdrawal, there is no claim that Singer's appointed counsel rendered ineffective assistance.[10] We thus reject these arguments.

We therefore conclude that Judge Eisele's remedial order was not inadequate to shield Singer from prejudice resulting from the government's intrusion into the Meshbesher file, and that Singer was not denied effective assistance of counsel as guaranteed by the sixth amendment. By so concluding, we do not condone the conduct of Schermer and Johnson, who, on the basis

---

8. Stoll admitted to his personal animosity toward Singer. He admitted that he had been a fugitive following his arrest, that he had used aliases and failed to file tax returns. He admitted that he had pleaded guilty and agreed to cooperate and to testify to avoid exposure to a longer potential prison sentence. He also admitted to having committed numerous other crimes.

9. Singer also complains that Michael Strauss, an officer in the Minneapolis Police Force who reviewed the file, also should have been barred from testifying. Our review of the record con-

vinces us that this testimony was not tainted by a study of the file. In addition, we observe that Strauss' testimony concerned the Minneapolis-based conspirators, and did not directly implicate Singer.

10. Singer also claims that the government's possession of the file adversely affected his ability to bargain for a plea. Not even a germ of this argument finds root in the record, and we therefore need not address it. *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976).

of claims by an interested party indiscriminately sought out documents of suspect origin that they knew to be privileged.[11] We conclude only that Judge Eisele's carefully shaped remedial order was not inadequate under the standard set out by the Supreme Court in *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564, to restore Singer's sixth amendment protections.

## II.

Singer contends that the indictment should be dismissed because government officials' statements to the press suggesting that Gilbert Singer had committed perjury and Meshbesher had suborned perjury disrupted the attorney-client relationship and forced Meshbesher to withdraw, thus denying Singer his sixth amendment right to effective representation by his counsel of choice.

■ Judge Eisele found that law enforcement officials involved in prosecuting Singer leaked unproven assertions to the press, which potentially compromised Meshbesher's effectiveness as an advocate. He concluded that even though these statements were made without intent to interfere with the Meshbesher-Singer attorney-client relationship, they nonetheless were improper, and threatened to prejudice Singer, resulting in a sixth amendment violation.[12] We do not hesitate to add that Judge Lord's statements to the press, and his letter to Judge Murphy, also violated well-recognized ethical standards and in ad-

dition, created the potential for substantial prejudice to defendant.

■ We repeatedly have recognized that a defendant's sixth amendment right to his counsel of choice should be protected. *United States v. Agosto*, 675 F.2d 965, 969 (8th Cir.), *cert. denied*, 459 U.S. 834, 103 S.Ct. 77, 74 L.Ed.2d 74 (1982); *United States v. Cox*, 580 F.2d 317, 321 (8th Cir. 1978), *cert. denied*, 439 U.S. 1075, 99 S.Ct. 851, 59 L.Ed.2d 43 (1979). The question, however, is whether this independent sixth amendment violation necessitated imposition of the drastic remedy of dismissal of the indictment. Judge Eisele, again relying on *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564, found that either the passage of time or the shifting of the trial to a different locale would serve to dissipate any derogation to Meshbesher's integrity resulting from governmental impropriety. There has been no showing that this finding is clearly erroneous. *See United States v. Costanzo*, 740 F.2d 251, 254–55 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 3477, 87 L.Ed.2d 613 (1985) (district court's finding that no prejudice would flow from an alleged sixth amendment violation is reviewable under the clearly erroneous standard). Judge Eisele then permitted Singer to move for a continuance or a change of venue. In so doing, Judge Eisele tailored a remedy to avoid prejudice and to remove the taint of the violation. Thus, despite the sixth amendment violation, Meshbesher was not forced to withdraw as trial counsel.[13]

---

**11.** The defendant invites us to examine whether an intrusion into the attorney-client relationship violative of the sixth amendment would have resulted even if the government had taken appropriate precaution and obtained only those documents which provided evidence of Gilbert Singer's perjury. Judge Eisele's conclusion that Johnson and Schermer violated Singer's constitutional rights makes such examination unnecessary. However, we do emphasize that the government in this case clearly failed to exercise the caution necessary to protect plainly privileged documents which were immaterial to the commission of any crime.

**12.** Judge Eisele further observed, after reviewing the confidential documents: "It is clear

now, after the fact, that very few, if any, of those file documents constitute actual evidence of perjury." Appellant's Addendum at 74. At the time this case was submitted, the government still had not initiated prosecution against either Gilbert Singer or Meshbesher on the charges of perjury or subornation of perjury.

**13.** Singer argues that when the government impermissibly interferes with defendant's right to counsel of his choice, a defendant does not have to demonstrate actual prejudice to establish a sixth amendment violation. *See, e.g., Linton v. Perini*, 656 F.2d 207 (6th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1036, 71 L.Ed.2d 318 (1982). This argument falters on two grounds. First, Judge Eisele found that a sixth amend-

### III.

This court, after Singer's first trial, concluded that Judge Lord's misconduct had resulted in an unfair trial. *United States v. Singer,* 687 F.2d 1135 (8th Cir.1982), *rev'd on rehearing en banc,* 710 F.2d 431 (1983). We therefore ordered a new trial. We did observe, however, that the trial presented "by no means a case of actual bias on the part of the trial judge." *Id.* at 432. Singer now charges that when viewed through the lens of the subsequent misconduct, it is clear that Judge Lord's improprieties at trial indeed were motivated by a desire to prejudice Singer's prospects for acquittal. Such purposeful misconduct, he argues, should have operated to bar his retrial as violative of the prohibition against double jeopardy.

The double jeopardy clause of the fifth amendment protects a criminal defendant from repeated prosecution for the same offense. *Oregon v. Kennedy,* 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982). The many purposes advanced by the double jeopardy prohibition are best expressed by Justice Harlan's conclusion in *United States v. Jorn,* 400 U.S. 470, 486, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971) (plurality opinion), that the clause promotes the criminal defendant's general interest in being able, "once and for all, to conclude his confrontation with society." Thus, once a trial reaches a verdict, whether of conviction or acquittal, reprosecution is barred. *United States v. Scott,* 437 U.S. 82, 91, 98 S.Ct. 2187, 2193–94, 57 L.Ed.2d 65 (1978). Of course, if the trial ends in a verdict of guilty, but is reversed on appeal, the government may reinitiate prosecution. "It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceeding leading to conviction."

*United States v. Tateo,* 377 U.S. 463, 465–66, 84 S.Ct. 1587, 1588–89, 12 L.Ed.2d 448 (1964). The only established exception to this rule is where reversal of the conviction is grounded on insufficiency of the evidence, *United States v. DiFrancesco,* 449 U.S. 117, 130–31, 101 S.Ct. 426, 433–34, 66 L.Ed.2d 328 (1980), since this ruling is equivalent to a directed verdict of aquittal at trial. *Burks v. United States,* 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1978).

▇▇▇▇ Where no verdict is reached, but the trial ends in mistrial, the double jeopardy clause also ordinarily does not preclude retrial. *See, e.g., Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949) (retrial after hung jury does not implicate double jeopardy concerns). There is a narrow exception to this rule, however, when the defendant moves for and is granted a mistrial on the basis of deliberate prosecutorial or judicial misconduct.[14] To permit retrial in such a circumstance offends the interests supporting the double jeopardy bar because the misconduct compelled the defendant to forego his right to a fair trial leading to verdict before the first tribunal. *United States v. Dinitz,* 424 U.S. 600, 609–10, 96 S.Ct. 1075, 1080–81, 47 L.Ed.2d 267 (1976); *United States v. Jorn,* 400 U.S. at 485, 91 S.Ct. at 557.

At his first trial, Singer moved for a mistrial based on judicial misconduct. The motion was denied and a conviction followed. Subsequently, the conviction was overturned because of Judge Lord's misconduct at trial. We therefore face this question: Does the general rule advanced in *DiFrancesco* apply, that the double jeopardy bar does not foreclose reprosecution following appellate reversal of a conviction? Or does the narrow mistrial exception stated in *Dinitz* extend to a situation

---

ment violation had occurred. Thus, we need not resort to the *Linton* analysis. Second, and perhaps more telling, in *Linton,* the court did not dismiss the indictment as a result of the sixth amendment violation, but reversed the conviction and remanded for a new trial. *Id.* at 212.

**14.** What level of intent must motivate the misconduct to implicate double jeopardy interests, and whether the requisite intent level is the same for both prosecutorial and judicial misconduct, are questions not yet definitively answered. *See post* at 23–24.

where the earlier prosecution proceeded over defendant's mistrial motion for judicial misconduct to a verdict of conviction, only to be reversed on those same grounds?

While this issue has percolated in dicta through the several circuits,[15] it has yet to be addressed by the Supreme Court.[16] To this circuit it is one of first impression.

There is good reason to argue that a criminal defendant whose conviction over a timely motion for mistrial is reversed because of any sort of governmental misconduct should be placed on equal footing with a defendant whose motion properly is granted. The defendant obtains mistrial only if the trial judge apprehends the sufficiently prejudicial misconduct. In reversing, the appellate court simply corrects the trial court's error. The right of a criminal defendant not to be twice placed in jeopardy should not hang on which court correctly determines that misconduct infected the trial. *See Robinson v. Wade*, 686 F.2d at 307–08; *United States v. Curtis*, 683 F.2d at 774. As the Supreme Court stated in *United States v. Burks*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1, when explaining why double jeopardy concerns preclude retrial upon reversal for insufficient evidence, "[T]o hold otherwise would create a purely arbitrary distinction between those in petitioner's position and others who would enjoy the benefit of a correct decision by the District Court." *Id.* at 11, 98 S.Ct. at 2147.

But there is danger in drawing too much from *Burks'* grudging exception. Indeed, in *Burks* itself, the Court stated that governmental misconduct was not among the grounds for reversal that implicated the double jeopardy clause. *Id.* at 15, 98 S.Ct. at 2149. And as the Court added in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416: "This Court has consistently held that the Double Jeopardy Clause imposes no limitation upon the power of the government to retry a defendant who has succeeded in persuading a court to set his conviction aside, unless the conviction has been reversed because of insufficiency of the evidence." *Id.* at 677 n. 6, 102 S.Ct. at 2090 n. 6 (citation omitted).[17] If the bedrock interest supporting the double jeopardy prohibition is protection of the defendant's "valued right" to have a verdict rendered by the first jury, *Oregon v. Kennedy*, 456 U.S. at 674, 102 S.Ct. at 2088; *Wade v. Hunter*, 336 U.S. at 689, 69 S.Ct. at 837, then the dangers which the prohibition seeks to avoid are more attenuated when the first trial goes to verdict, since the defendant has not lost his chance for acquittal by the first jury. *United*

---

**15.** *See United States v. Head*, 697 F.2d 1200, 1206 n. 10 (4th Cir.1982), *cert. denied*, 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983); *Robinson v. Wade*, 686 F.2d 298, 305–09 (5th Cir.1982); *United States v. Curtis*, 683 F.2d 769, 772–76 (3d Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982); *United States v. Singleterry*, 683 F.2d 122, 123–24 (5th Cir.), *cert. denied*, 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982); *United States v. Roberts*, 640 F.2d 225, 227–28, 230–31 (9th Cir.) (Norris, J., dissenting), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981); *United States v. Rios*, 637 F.2d 728, 729 (10th Cir.1980), *cert. denied*, 452 U.S. 918, 101 S.Ct. 3054, 69 L.Ed.2d 422 (1981); *United States v. Opager*, 616 F.2d 231, 235–36 (5th Cir.1980). *See also Petrucelli v. Smith*, 544 F.Supp. 627, 632–40 (W.D.N.Y.1982), *aff'd sub nom, Petrocelli v. Coombe*, 735 F.2d 684 (2d Cir.1984); *Alicea v. Kuhlman*, 537 F.Supp. 1156, 1158–59 (S.D.N.Y.1982).

**16.** All Supreme Court cases considering the preclusive effect of prosecutorial or judicial misconduct emerged from situations in which a verdict had not been obtained. *See Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (mistrial); *Lee v. United States*, 432 U.S. 23, 97 S.Ct. 2141, 53 L.Ed.2d 80 (1977) (dismissed on defective information); *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (mistrial); *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (mistrial); *United States v. Tateo*, 377 U.S. 463, 84 S.Ct. 1587, 12 L.Ed.2d 448 (guilty plea); *Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (mistrial); *Gori v. United States*, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (mistrial).

**17.** The narrowness of this exception is highlighted by the Court's holding in *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), that retrial is permitted arter a state appellate court's reversal of a conviction that, while sufficient to support the jury verdict, was against the weight of the evidence.

*States v. Singleterry*, 683 F.2d at 124. Thus it can persuasively be argued that the double jeopardy clause should not be read to impose the drastic remedy of dismissal of the indictment following reversal of a conviction on the basis of misconduct.

■ Like other courts, we recognize that this is a complicated and close question. *See, e.g., United States v. Curtis*, 683 F.2d at 772. Its resolution, however, is not necessary to this appeal. Although we do not condone Judge Lord's behavior, we do not believe it manifests the intent required to implicate double jeopardy concerns.

In *United States v. Dinitz*, 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976), the Supreme Court considered when the double jeopardy clause would bar reprosecution after dismissal due to judicial misconduct and the double jeopardy clause. In *Dinitz*, the defendant made an unopposed motion for a mistrial after the trial judge expelled his attorney from the courtroom for impropriety in his opening statement. The defendant was retried and convicted. The Supreme Court rejected the argument that retrial was barred by the double jeopardy clause. The Court admitted that the judge's action was improper, but reasoned that it did not reflect the intent level necessary to bar retrial. "[It] was not done in bad faith in order to goad the respondent into requesting a mistrial or to prejudice his prospects for an acquittal." *Id.* at 612, 96 S.Ct. at 1082. In so holding the Court echoed the standard established in *United States v. Jorn*, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1970) (plurality opinion), which also involved judicial misconduct.

The Court has since refined this standard. In *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), involving prosecutorial misconduct, the Court held that double jeopardy interests attach only when "the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." *Id.* at 680, 102 S.Ct. at 2091. In announcing this narrower standard, the Court explicitly rejected the "bad faith" and "prejudice" language it

earlier had offered. *Id.* The Court, however, did not make clear whether the new standard applies to judicial as well as prosecutorial misconduct. *Kennedy* involved only prosecutorial misconduct. Moreover, the rationale the Court employed, that "Every act on the part of a rational prosecutor during a trial is designed to 'prejudice' the defendant by placing before the judge or jury evidence leading to a finding of his guilt," *Id.* at 675, 102 S.Ct. at 2089, would seem anomalous in the context of judicial misconduct. Every act on the part of the trial judge, obviously, is designed not to prejudice the defendant, but to ensure fairness. *See Rochin v. California*, 342 U.S. 165, 171–72, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). On the other hand, the Court's frequent reference to *Dinitz* and *Jorn*, and its repeated mention, as if in one breath, to prosecutorial *and* judicial misconduct—both appear in the paragraph immediately preceding the Court's statement of its holding—leave a question as to the intended scope of *Kennedy*.

Regardless of which standard should apply, we do not believe this is a case that implicates double jeopardy concerns. Judge Lord's misconduct at the first trial was sufficiently objectionable to require reversal of the conviction. But even when colored by his post-trial misconduct, it does not evince the bad faith or design to prejudice the defendant's prospects for acquittal that the Court asserted even in *Dinitz* and *Jorn* are prerequisite to invocation of the double jeopardy bar. As we stated in our decision after en banc review,

> On the whole, it seems clear to us that the court believed the evidence of the defendants' guilt was strong, but that the case was a complicated one, and that justice might not be done if government counsel were left to his own devices.

*United States v. Singer*, 710 F.2d at 436. We are not persuaded to move from our en banc conclusion that Judge Lord's conduct at trial, while improper, did not demonstrate "actual bias." *Id.* at 432.

Singer points to three acts which he argues illuminate Judge Lord's motives at

trial: first, his *ex parte* meeting with Assistant United States Attorney Schermer in April, 1981, between the time of Singer's conviction and his filing of post-trial motions, where he expressed his concern over the adequacy of the trial record; second, his statements to the press on July 23, 1983, after this court's en banc reversal of defendant's conviction and on September 16, 1983, after it was revealed that the United States Attorney possessed the confidential attorney-client documents; and third, his letter to Judge Murphy on September 20, 1983, criticizing Meshbesher and offering to testify. These acts have been roundly condemned by Judge Eisele and we join in his condemnation. However, we do not believe that they speak with any certainty to Judge Lord's motives during trial.

First, all of the demonstrated improprieties were committed after the jury returned its conviction. The episodes involving the press statements and the letter to Judge Murphy occurred several years after the trial. We do not think it possible to divine by acts so distant in time any motive for the relevant trial misconduct. Second, even if we could, we believe these acts demonstrate nothing more than Judge Lord's concern that the conviction, which he clearly believed served the ends of justice, not be reversed. While we have no doubt that Judge Lord overstepped the ethical bounds in pursuit of this end, we do not believe it evinces a bad faith motive.

We therefore conclude that Judge Lord's misconduct at trial was not driven by the kind of motive that would allow invocation of the double jeopardy prohibition. Under the circumstances of this case, retrial was the proper course.

## IV.

■ Singer contends that on retrial the court violated his sixth amendment right to confrontation by permitting government witness Stoll to invoke the fifth amendment privilege against self-incrimination, and by refusing to strike his entire testimony once the privilege had been invoked. Stoll claimed the privilege during cross-examination regarding his acquisition of the confidential attorney-client file.

At the outset, we observe that Stoll repeatedly, explicitly, and successfully asserted his fifth amendment right during his testimony at the Eisele hearings and at retrial before Judge Murphy. The question then arises whether Stoll, by his testimony at the hearings, implicitly waived the privilege. In *Klein v. Harris*, 667 F.2d 274 (2d Cir.1981), the Second Circuit articulated a useful test to determine whether a witness has waived the fifth amendment privilege. Under this analysis, a trial or reviewing court must infer waiver from a witness' prior statements if:

> (1) the witness' prior statements have created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth, and (2) the witness had reason to know that his prior statements would be interpreted as a waiver of the fifth amendment's privilege against self-incrimination.

*Id.* at 287. We believe that neither part of this test is satisfied.

Stoll's statements on retrial created no significant likelihood that the jury would be left with a distorted view of the truth. On the contrary, his testimony was fairly corroborated by the testimony of the unindicted co-conspirators and the police officers, and by the substantial documentary and physical evidence. Stoll also could not reasonably have believed that his prior testimony would be viewed as a waiver. While Stoll did testify at *in camera* hearings before Judge Eisele regarding his acquisition of the confidential file, he successfully asserted the privilege when questioned about how the documents actually had been removed from Meshbesher's office. The possibility of prosecution for burglary or theft, of course, still existed. To withdraw the grant of privilege upon similar inquiries at trial would do violence to Stoll's reasonable expectation that it would be respected. Judge Murphy determined that the privilege had not been waived. She did not err in this conclusion.

Although Stoll's invocation of the fifth amendment privilege prevented Singer from cross-examining him regarding his knowledge of how the file was taken from Meshbesher's office, Singer's sixth amendment right to confrontation was not abrogated when the court refused to strike Stoll's entire testimony.

The right to confrontation includes the right to cross-examine adverse witnesses. *Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965). When a conflict of rights arises between a witness' fifth amendment privilege against self-incrimination and the defendant's sixth amendment right to confrontation, a balance must be struck. *Ellis v. Black*, 732 F.2d 650, 656 (8th Cir.1984); *United States v. Gould*, 536 F.2d 216, 222 (8th Cir.1976). If the subject upon which the witness refuses to testify relates to matters elicited by the government on direct examination and the defendant's counsel is prejudicially impaired in his ability to assail the truthfulness of the direct testimony, the court should strike at least the relevant portion of the testimony. *United States v. Humphrey*, 696 F.2d 72, 75 (8th Cir.1982), *cert. denied*, 459 U.S. 1222, 103 S.Ct. 1230, 75 L.Ed.2d 463 (1983). On the other hand, if the witness' invocation of the privilege prevents the defendant's inquiry into merely collateral matters, such as credibility, the defendant has suffered no prejudice and the witness' other testimony need not be stricken. *Ellis v. Black*, 732 F.2d at 656; *United States v. Brierly*, 501 F.2d 1024, 1027 (8th Cir.), *cert. denied*, 419 U.S. 1052, 95 S.Ct. 631, 42 L.Ed.2d 648 (1974). This balancing includes the effectiveness of the cross-examination as a whole. Thus, if the defendant has available effective alternative means of exploring relevant matters on cross-examination, sixth amendment rights remain intact. *Ellis v. Black*, 732 F.2d at 650.

Singer asserts here, as he did at retrial, that his attempt to cross-examine Stoll regarding his acquisition of the file was driven by two purposes. First, Singer sought to establish that the witness had stolen the file so that he could negotiate a favorable plea bargain with the government. Judge Eisele, however, found specifically after an evidentiary hearing that the file was removed from Meshbesher's office by someone other than Stoll. In addition, inquiry into the circumstances and terms of Stoll's plea agreement goes to Stoll's credibility, and therefore is a collateral issue. Singer had adequate opportunity to attack Stoll's credibility, and indeed, as amply demonstrated by the record, elicited substantial impeachment evidence. Second, Singer sought to show that Stoll's direct testimony was influenced by his review of the documents. While this purpose does go to the reliability of Stoll's direct testimony, Singer's counsel was permitted to ask Stoll whether he had read the documents before testifying. Such permissible inquiry effectively provided Singer the means to pursue his purpose without endangering Stoll's fifth amendment protection.

The sixth amendment confrontation rights of a defendant are met when defense counsel is permitted to effectively challenge the truthfulness of the direct testimony and pursue impeachment of the witness so as to "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliabilitiy of the witness." *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974). Judge Murphy properly reconciled the conflict of rights by permitting such inquiry while protecting the witness' fifth amendment privilege. Thus, there was no basis to strike Stoll's direct testimony.

Finally, Stoll's credibility was thoroughly impeached upon cross-examination. Moreover, the testimony of the remaining government witnesses and additional documentary and physical evidence introduced provided an overwhelming basis for the jury to return a conviction. Violations of the confrontation clause may, in the appropriate case, be declared harmless. *Schneble v. Florida*, 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

If any error had been committed by Judge Murphy to prevent Singer from fully cross-examining Stoll and by refusing to strike Stoll's remaining testimony, it is harmless beyond a reasonable doubt under Fed.R. Crim.P. 52(a). *See United States v. Hastings*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1982).

### V.

■ Finally, Singer urges this court, because of the various demonstrated acts of governmental misconduct, to exercise its supervisory authority over the administration of criminal justice, to dismiss this indictment.

These proceedings have exposed acts of police, prosecutorial, and judicial misconduct and impropriety. Police and prosecutors have engaged in *ex parte* meetings with Judge Lord. The Minneapolis Chief of Police offered unproven accusations to the press. The office of the United States Attorney sought, obtained, and reviewed privileged documents unrelated to the discovery of evidence of other crimes. We condemn these actions. The Supreme Court warned in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, * *. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Id.* at 88, 55 S.Ct. at 633. These principles apply with equal force to the police.

Even more deeply distressing is Judge Lord's misconduct. He "assume[d] the mantle of an advocate" at trial, *United States v. Singer*, 710 F.2d at 438 (Lay, C.J.,

concurring), and initiated at least one *ex parte* meeting with the prosecutor to advise on how to avoid reversal of the conviction. These acts of misconduct already have been criticized. We reemphasize, such misconduct cannot be tolerated. Judge Lord also made unproven and damaging statements to the press. We acknowledge that these comments may have been driven by an understandable concern that perjury had been committed in his courtroom. But Judge Lord had at his disposal acceptable procedures to address the perceived violation. Trial by press undermines the delicate processes carefully crafted to do justice. Judge Lord also wrote to a fellow judge on a pending action. A letter to a fellow judge creates at minimum substantial appearance of impropriety.

Judge Lord's misconduct at trial and afterward caused one reversal in this case and created a serious possibility of reversal in this second appeal. The public should not be made to suffer these assaults. The weight of the criminal justice system rests on our respect for process and disregard of outcome. The trial judge is the cornerstone of this system; he must double-shoulder the weight, not with action but with sound restraint. He must strain to preside with self-disciplined impartiality to achieve a just verdict. To this cause Judge Lord shrugged, and let the weight fall.

But we cannot say that the weight fell on Mark Singer. He has had two trials, three appeals, and numerous ancillary hearings. He has been twice convicted, and twice sentenced to 10-year terms. And yet, although it has been nearly eight years since his arrest, our system, despite its failings in this case, or perhaps because of them, has not required him to spend one night in prison. The evidence of Singer's guilt, however, is overwhelming. And while these proceedings have suffered much error, the error, as it pertains to Singer's conviction of guilt, is harmless beyond a reasonable doubt. The Supreme Court has admonished the courts of appeals to refrain from exercise of our supervisory authority

over the administration of criminal justice when the error is harmless. *United States v. Hastings*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1982). We therefore follow that directive, and reject Singer's request to dismiss the indictment.

We affirm the judgment of conviction.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent.

The majority today agrees with Judge Eisele's ruling that the Government's conduct violated Mark Lewis Singer's sixth amendment right to be represented by counsel of his choice and upholds Judge Eisele's remedy for that violation. The majority concludes that by permitting Singer to move for a continuance or a change of venue, Judge Eisele fashioned a remedy which enabled Ronald Meshbesher to remain as Singer's trial counsel, thereby removing the prejudice to Singer and effectively curing the sixth amendment violation. I disagree. Against the background of the Government's highly improper conduct, Meshbesher had no choice except to withdraw. In my opinion Judge Eisele's order did not serve as a curative for the Government's conduct. Under the circumstances of this case, I believe that the proper remedy is dismissal of Singer's indictment.[1]

**I.**

The sixth amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence." This right is "indispensable to the fair administration of our adversarial system of jus-

tice" and "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding." *Maine v. Moulton*, —— U.S. ——, 106 S.Ct. 477, 483–84, 88 L.Ed.2d 481 (1985) (footnote omitted).[2] It has long been recognized that the sixth amendment's broad guarantee of counsel includes the right to be represented by counsel of one's choice. *Glasser v. United States*, 315 U.S. 60, 70, 62 S.Ct. 457, 464–65, 86 L.Ed. 680 (1942); *United States v. Agosto*, 675 F.2d 965, 969 (8th Cir.1982).[3]

The Supreme Court has indicated that to establish a sixth amendment violation a criminal defendant must show that the government knowingly intruded into the attorney-client relationship, and that the intrusion created a "realistic possibility" of prejudice to the defendant or "benefit" to the prosecution. *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). *See also United States v. Mastroianni*, 749 F.2d 900, 907 (1st Cir.1984); *United States v. Davis*, 646 F.2d 1298, 1303 (8th Cir.), *cert. denied*, 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). As the majority notes, the establishment of a sixth amendment violation alone, however, does not require dismissal of a criminal defendant's indictment. *See* Majority Opinion at 234–35.

In *United States v. Morrison*, 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981), the Supreme Court held that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment" is not a proper remedy for the violation of a criminal defendant's sixth amendment

---

1. Because I believe that under the circumstances of this case the Government's violation of Singer's sixth amendment right to counsel requires dismissal of his indictment, I do not reach the other issues raised on appeal.

2. In *Maine v. Moulton*, —— U.S. ——, 106 S.Ct. 477, 485, 88 L.Ed.2d 481 (1985), the Supreme Court said that "at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to

counsel." This is exactly what occurred in the present case.

3. It is of course true that the sixth amendment right to be represented by counsel of one's choice is not absolute. *United States v. Agosto*, 675 F.2d 965, 970 n. 4 (8th Cir.1982). *See also United States v. Rankin*, 779 F.2d 956, 958 (3d Cir.1986). This is not the type of case, however, in which the extent of that right should be circumscribed.

rights.[4] The Court stated that cases involving sixth amendment deprivations are subject to the rule that remedies should be tailored to the injuries suffered from the constitutional violation. *Id.* at 364, 101 S.Ct. at 667. *See also United States v. Solomon,* 679 F.2d 1246, 1250–51 (8th Cir. 1982).

## II.

In the present case Judge Eisele found that law enforcement officials charged with prosecuting Singer made improper, unproven allegations that Meshbesher had suborned perjury. He concluded that these statements interfered with the attorney-client relationship between Meshbesher and Singer and threatened to prejudice Singer, thereby resulting in a sixth amendment violation. The question then becomes what is the appropriate remedy for this violation.

Judge Eisele found, in the majority's words, "that either the passage of time or the shifting of the trial to a different locale would serve to dissipate any derogation to Meshbesher's integrity resulting from governmental impropriety." Therefore, relying on *Morrison,* Judge Eisele permitted Singer to move for a continuance or a change of venue. The majority approves of Judge Eisele's findings and upholds his remedy, concluding that it allows Meshbesher to remain as Singer's trial counsel and therefore removes the taint of the sixth amendment violation. I disagree.

The "governmental impropriety" did more than simply disparage "Meshbesher's integrity." I believe that the allegations made by Government officers that Meshbesher suborned perjury, and the prosecutors' veiled threats of prosecution, disrupted Meshbesher's ability to zealously represent Singer, and created a situation in which the taint placed on Meshbesher by the Government's conduct might wash off on Singer in a trial in which Meshbesher

was trial counsel. Meshbesher, therefore, was forced to withdraw and Singer was injured by losing the services of his counsel of choice. Under *Morrison,* I believe that this is "demonstrable prejudice" which justifies dismissal of Singer's indictment. I would therefore reverse.

---

**4.** It is important to note that in *Morrison* the Supreme Court did not create a *per se* rule against the dismissal of a defendant's indictment for a violation of his sixth amendment rights. The Court merely stated that there had to be an appropriate showing of prejudice to warrant dismissal of a defendant's indictment.

In *Morrison* the Court stated that no prejudice had been demonstrated and noted the record

did "not reveal a pattern of recurring violations by investigative officers that might warrant the imposition of a more extreme remedy in order to deter further lawlessness." 449 U.S. at 365–66 n. 2, 101 S.Ct. at 668 n. 2. I believe that the present case contains precisely the kind of actual prejudice and recurring violations that require dismissal of Singer's indictment.