710 F.2d 431
 14 Fed. R. Evid. Serv. 1235
 UNITED STATES of America, Appellee,
v.
Mark Lewis SINGER, Appellant.
UNITED STATES of America, Appellee,
v.
Oakley Bechtel CLINE, III, Appellant.
UNITED STATES of America, Appellee,
v.
Joseph Michael SAZENSKI, Appellant.
UNITED STATES of America, Appellee,
v.
Arturo IZQUIERDO, Appellant.
UNITED STATES of America, Appellee,
v.
John Patrick REYNOLDS, Appellant.
 Nos. 81-1654, 81-1673, 81-1677, 81-1678 and 81-1679.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1983.
Decided June 20, 1983.
 
 Meshbesher, Singer & Spence, Ltd., Ronald I. Meshbesher, Carol M. Grant, Minneapolis, Minn., for Mark Lewis Singer.
 Bruce Hartigan, Minneapolis, Minn., for Oakley Bechtel Cline, III.
 James M. Rosenbaum, U.S. Atty., Daniel W. Schermer, Asst. U.S. Atty., D. Minnesota, Minneapolis, Minn., for appellee.
 Friedberg & Peterson, Mark W. Peterson, Minneapolis, Minn., for Joseph Michael Sazenski.
 Phillip S. Resnick, Resnick & Bartsh, Minneapolis, Minn, for Arturo Izquierdo.
 Before LAY, Chief Judge, HEANEY, BRIGHT and ROSS, Circuit Judges, HENLEY, Senior Circuit Judge, and McMILLIAN, ARNOLD, JOHN R. GIBSON and FAGG, Circuit Judges, en banc.
 ARNOLD, Circuit Judge.
 
 
 1
 Defendants Mark Lewis Singer, Oakley Bechtel Cline, III, Arturo Izquierdo, Joseph Michael Sazenski, and John Patrick Reynolds appeal from their convictions on a number of drug-related offenses. The principal question presented is whether the District Court so far injected itself into the trial as to give the jury the impression that it favored the prosecution, thus depriving defendants of a fair trial. Although this is by no means a case of actual bias on the part of the trial judge, our review of the record constrains us to hold that his repeated remarks in the presence of the jury, culminating in a reference to his "helping the Government to try its case," prevented the defendants from having their guilt or innocence determined in a proceeding free of a fatal appearance of unfairness. We therefore, in the exercise of our supervisory power over the administration of criminal justice in this Circuit, reverse the judgments of conviction and remand this case for a new trial.
 
 I.
 
 2
 This case was originally submitted to a panel of this Court, and an opinion was filed affirming the convictions, one judge dissenting. United States v. Singer, 687 F.2d 1135 (8th Cir.1982). We adopt the statement of facts contained in part I of the panel opinion. We also adopt parts III and IV of the panel opinion. Specifically, we agree with the panel that the grounds urged by appellants in support of reversal (apart from the question of the District Court's conduct of the trial) are without merit. The panel's unanimous decision rejecting each of these grounds is adopted and reaffirmed.
 
 II.
 
 3
 This case was tried before a jury from December 8, 1980, to December 18, 1980. It was a complex multi-defendant trial, with each of the six[1] defendants who went to trial retaining his own lawyer. An Assistant United States Attorney tried the case on the government side alone. The District Court early became dissatisfied with the conduct of the government's case. On December 10, the third day of the trial, the court summoned the United States Attorney to a conference in chambers. The conference began as follows (Tr. 311):
 
 
 4
 THE COURT: You may recognize an array of faces as being the cream of the crop of the Criminal Bar of the State of Minnesota, most of them specializing in Federal practice.
 
 
 5
 Yesterday I wrote a note which was delivered to Mr. Berg [the United States Attorney] which said I thought he ought to have a backup man for [the Assistant United States Attorney trying the case] in Court here. It's Christmastime, it's the beginning of winter, it's the flu time, and I thought we don't want this case delayed because we lost somebody.
 
 
 6
 Now I could go on to give you some other reasons why I thought you should have a backup man. But can't you assign somebody up here this morning to start with us?
 
 
 7
 Mr. Berg declined. The District Court then ordered the United States to send another Assistant United States Attorney "to second-chair this man. That's an order. And we'll wait until he comes, before we go on with the case.... And if he is not here by noon, I will dismiss the case" (Tr. 312-13). The United States Attorney asked for a recess to consider the matter, following which the judge relented and agreed to allow the trial to proceed without additional counsel on the prosecution side. The court warned that "I am not going to try the Government's case for it, like I've been doing up to this time " (Tr. 317) (emphasis ours).
 
 
 8
 The trial judge nevertheless continued to help government counsel in the presence of the jury. As the trial continued, the court helped the government again and again. The judge admonished the prosecutor:
 
 
 9
 You've just about got that question so that it's unintelligible because it's about four questions in one.
 
 
 10
 What do you want him to say?, did he look at the stuff coming back from Minnesota? (Tr. 1057).
 
 
 11
 He instructed him on when, how, and on what grounds to object.
 
 
 12
 THE COURT: ... [W]hat are you doing there?
 
 
 13
 [GOVERNMENT COUNSEL]: Your Honor, I was just considering making an objection, objecting on the grounds of lack of relevance.
 
 
 14
 THE COURT: Well, that's a good thought. You are still here, however, aren't you?
 
 
 15
 [GOVERNMENT COUNSEL]: Yes, I am, Your Honor, I am objecting.
 
 
 16
 THE COURT: Have you thought anything about repetitiveness?
 
 
 17
 [GOVERNMENT COUNSEL]: Your Honor, I object also on the grounds of repetitiveness.
 
 
 18
 THE COURT: All right. Now when you come to a specific question, you make the objection and let me rule on it.
 
 
 19
 The question has been asked and answered now, but you might be just a little more aggressive here--or we'll be here for a month (Tr. 630-31).
 
 
 20
 The judge was concerned that government counsel elicit testimony properly and avoid objections. "Just a minute. Lay a little more foundation than that. 'Was there a time when another person came?' That's the way you do that, you see?" (Tr. 677). He directed government counsel when to end questioning (Tr. 789), and, apparently exasperated over the inability of government counsel to examine a witness properly, he took over the questioning himself.
 
 REDIRECT EXAMINATION:
 
 21
 [BY GOVERNMENT COUNSEL]:
 
 
 22
 Q. You've described material you seized as marijuana?
 
 
 23
 MR. RESNICK: I will object to the reference to it as marijuana because it has not yet been identified as that.
 
 
 24
 THE COURT: Lay the foundation.
 
 
 25
 [GOVERNMENT COUNSEL]: Yes.
 
 
 26
 [GOVERNMENT COUNSEL]:
 
 
 27
 Q. Did you see some material--
 
 
 28
 THE COURT: Wait, wait.
 
 
 29
 Does he know marijuana from a bale of hay?
 
 
 30
 [GOVERNMENT COUNSEL]:
 
 
 31
 Q. Do you know what marijuana looks like?
 
 
 32
 A. Yes, I do.
 
 
 33
 MR. RESNICK: I object to that as lack of proper foundation.
 
 
 34
 THE COURT: How does he know?
 
 
 35
 [GOVERNMENT COUNSEL]:
 
 
 36
 Q. How do you know what marijuana looks like?
 
 
 37
 A. Because I've come in contact with marijuana on numerous occasions in the course of my duties with the Police Department.
 
 
 38
 * * *
 
 
 39
 * * *
 
 
 40
 Q. Could you describe what the substance looked like that you seized?
 
 
 41
 THE COURT: Now, let's talk about what marijuana looks like.
 
 
 42
 [GOVERNMENT COUNSEL]:
 
 
 43
 Q. What does marijuana look like?
 
 
 44
 THE COURT: In a bale.
 
 
 45
 A. Marijuana in a bale--just like a hay bale, but it's wrapped up, usually, in burlap, sometimes in plastic.
 
 
 46
 MR. RESNICK: I will object to the packaging. He asked what marijuana looks like, Your Honor. Not responsive to the question.
 
 
 47
 THE COURT: I think there is something to that. Let's look at the material. You know, if you saw a truck riding down the street and it had little windows in it, would you say there were horses in there?
 
 
 48
 A. Yes, I would, Your Honor.
 
 
 49
 THE COURT: You would?
 
 
 50
 Wouldn't it take a kind of a little smell to confirm that?
 
 
 51
 (Laughter.)
 
 
 52
 A. Yes, Your Honor.
 
 
 53
 THE COURT: What does marijuana look like, what does it smell like, what does it feel like?
 
 
 54
 If you know all of those things, we'll let you go on.
 
 
 55
 If you don't, we'll send you back to Florida.
 
 
 56
 * * *
 
 
 57
 * * *
 
 
 58
 THE COURT: Ask him a question please.
 
 
 59
 I've given you a hint as to what you might ask him.
 
 
 60
 [GOVERNMENT COUNSEL]: Yes.
 
 
 61
 [BY GOVERNMENT COUNSEL]:
 
 
 62
 Q. Would you tell the members of the jury what marijuana looks like and smells like, just a physical description?
 
 
 63
 THE COURT: One question at a time.
 
 
 64
 [BY GOVERNMENT COUNSEL]:
 
 
 65
 Q. What does marijuana look like?
 
 
 66
 THE COURT: What color is it?
 
 
 67
 A. Sometimes it's green, sometimes it's gold, goldish-tan color, depending on where it comes from.
 
 
 68
 THE COURT: What is the texture of it? What do the little things look like?
 
 
 69
 A. It has the texture of a leaf. And the marijuana plant has five leaves on it.
 
 
 70
 * * *
 
 
 71
 * * *
 
 
 72
 [GOVERNMENT COUNSEL]: Okay, I'll go on to the--
 
 
 73
 THE COURT: Does it have any seeds in it?
 
 
 74
 [BY GOVERNMENT COUNSEL]:
 
 
 75
 Q. Does it have seeds on it?
 
 
 76
 A. Yes, it does.
 
 
 77
 THE COURT: Do the leaves have any little pointees [sic] on them? (Tr. 648-53).
 
 
 78
 These examples are only illustrations. The trial court injected itself into the proceedings in a similar fashion on several other occasions. See, e.g., Tr. 677, 1014-15, 1057.
 
 
 79
 Matters came to a head on Monday, December 15, 1980, the sixth day of trial. That morning, government counsel of his own accord corrected a statement he had made earlier to the effect that Izquierdo's fingerprints had been found on a certain lease application. Counsel for Izquierdo moved for a mistrial.[2] The District Court (properly) found that the prosecutor's error had been unintentional. When Izquierdo's lawyer then attempted to press his motion, the court interrupted him (Tr. 974):
 
 
 80
 THE COURT: Hey, there's one lawyer up here who I wanted them to get some help for, and they won't send him any.
 
 
 81
 MR. RESNICK: Well, that's not my fault.
 
 
 82
 THE COURT: And he's just about overwhelmed.
 
 
 83
 Now, Jurors, there is no fingerprint of Mr. Izquierdo on that thing.
 
 
 84
 Mr. Schermer made a mistake.
 
 
 85
 So I think you can put that out of your mind, can't you, Jurors?
 
 
 86
 (Jurors nod their heads affirmatively.)
 
 
 87
 THE COURT: The motion for mistrial is denied.
 
 
 88
 The jury is to disregard that.
 
 
 89
 It didn't happen.
 
 
 90
 It was a mistake.
 
 
 91
 Later that day, during a conference in chambers, the defense again moved for a mistrial, this time on the ground that, because of the court's remarks earlier that day, "they're [the jury] going to feel sorry for this guy [the Assistant United States Attorney], and as a result it's going to redound to our prejudice" (Tr. 1022-23). The court denied the motion, observing (Tr. 1025-26):
 
 
 92
 I am not letting Schermer make mistakes. He's tried to make several of them, and I just must concede that I have straightened him out.
 
 
 93
 And I asked U.S. Attorney Tom Berg to send somebody up here to help him, and Berg wouldn't do it.
 
 
 94
 But the statement I made to the jury about this man being overwhelmed was unfortunate--but I am going to straighten that out for you.
 
 
 95
 * * *
 
 
 96
 * * *
 
 
 97
 And I will straighten them out on the one mistake which I made, which was to say that Schermer was overwhelmed; and--even though it's true--I will straighten it out.
 
 
 98
 The jurors then returned to the courtroom, and the following took place (Tr. 1026-27):
 
 
 99
 THE COURT: Ladies and Gentlemen of the jury, I should tell you something.
 
 
 100
 I made a mistake, and it really probably isn't even factually true.
 
 
 101
 When Mr. Schermer made that mistake where he said the wrong fingerprints were on the exhibit--he said the fingerprints were from a room that was rented over there, whereas in reality the fingerprints were in what he claims is a drug book--do you remember that?
 
 
 102
 (The jurors nod affirmatively.)
 
 
 103
 THE COURT: --that was a mistake he made.
 
 
 104
 I made a mistake, too, in trying to get this in perspective and set up so that you would understand it, and I said, "Well, Schermer's busy and he's overwhelmed."
 
 
 105
 Well, he is not overwhelmed.
 
 
 106
 He represents the Government; and if the Government can't send enough people up here to do their case right, then they deserve to lose if--by so doing--they don't get the evidence in and make mistakes and mess up the case.
 
 
 107
 So don't go feeling sorry for Schermer. He's tried dozens of cases for the Federal Department of Justice, criminal income-tax cases, he's tried narcotics cases, he's done all kinds of things, and he has wonderful credentials.
 
 
 108
 Sometimes I make him do it my way, but don't go feeling sorry for him.
 
 
 109
 And I'm sorry I said that.
 
 
 110
 He is not overwhelmed.
 
 
 111
 He is a tiger.
 
 
 112
 Go ahead.
 
 
 113
 MR. SCHERMER: Thank you, Your Honor.
 
 
 114
 In context, the remark about counsel's being "a tiger" could not have been taken seriously.
 
 
 115
 A few minutes later, the court again interrupted government counsel, this time to keep him from what would apparently have been a breach of an agreement about the proper scope of a witness's examination. The judge instructed counsel as to how to proceed, addressed the witness directly himself, and then stated to the jury: "Now I hope you don't object to my helping the Government to try its case, Ladies and Gentlemen, and Counsel ... (Tr. 1029).
 
 
 116
 We have carefully studied the entire transcript of the trial, amounting to over 1,800 pages, and the passages we have quoted are a fair sampling. To be sure, every intervention by the trial court in the proceedings was not on the side of the government, and some of the comments that the court made may have been helpful to the defense. It is nevertheless true that most of the court's interventions were designed to clarify government testimony, to help government counsel, to indicate to government counsel when he should or should not make objections, to instruct government counsel on how to make his evidence more intelligible, to suggest to him when he should stop the examination of a witness, to indicate to him what he should write on a blackboard in order to illustrate a point to the jury, and the like. In addition, on numerous occasions the court took over the questioning of government witnesses in order to make sure that the somewhat complicated facts of this case were clearly explained. On the whole, it seems clear to us that the court believed the evidence of the defendants' guilt was strong, but that the case was a complicated one, and that justice might not be done if government counsel were left to his own devices.
 
 
 117
 While it is a judge's privilege and duty to take an active part in the trial where necessary to clarify evidence and assist the jury, a judge must studiously avoid one-sidedness. See Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933). In the case at hand the jury could well have inferred that the judge was siding with the government. While he undoubtedly thought that by aiding and correcting the government attorney, he was merely redressing the balance between several reputable defense lawyers and one "overwhelmed" government attorney, the obvious effects were 1) to place the defense at a disadvantage in the eyes of the jury by casting the prosecutor in the role of an underdog, United States v. Haley, 452 F.2d 391, 396 n. 2 (8th Cir.1971), cert. denied, 405 U.S. 978, 92 S.Ct. 1205, 31 L.Ed.2d 253 (1972); United States v. Guglielmini, 384 F.2d 602 (2d Cir.1967), and 2) to suggest to the jury that he favored the government's position.[3]
 
 
 118
 A few improper comments are not necessarily enough to require reversal. United States v. Porter, 441 F.2d 1204 (8th Cir.), cert. denied, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). Each case must turn on its own circumstances. Here, the judge injected himself into the trial throughout the entire proceeding. Chief Justice Hughes observed in Quercia v. United States, supra, 289 U.S. at 470, 53 S.Ct. at 699, that a judge's
 
 
 119
 privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." ... Starr v. United States, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841.
 
 
 120
 We have recently had occasion to explain the legal principles applicable in this kind of situation. In United States v. Bland, 697 F.2d 262, 265-66 (8th Cir.1983), we said:
 
 
 121
 This Court has always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge. This is particularly true in a long trial. In each case a balancing process must be employed to determine whether the trial judge's comments have pervaded the overall fairness of the proceedings. We think the balance is adversely tipped against the defendant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case. A trial judge's isolated questioning to clarify ambiguities is one thing; however, a trial judge cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant and his witnesses. A judge's slightest indication that he favors the government's case can have an immeasurable effect upon a jury. A trial judge should seldom intervene in the questioning of a witness and then only to clarify isolated testimony. A trial court should never assume the burden of direct or cross-examination.
 
 
 122
 (Footnotes and citations omitted) (emphasis supplied).
 
 
 123
 No two cases are alike, and there are differences between Bland and the case before us. The trial in Bland was much shorter, and there the defendant himself took the witness stand. Here, defendants did not testify, and the trial took a total of ten days, including voir dire, argument, instructions, and jury deliberation. On the other hand, the evidence against the defendant in Bland, was, if anything, even stronger than the case made against the defendants before us on this appeal. In Bland, the charge was possession of an unregistered firearm by a felon, and a police officer actually saw Bland with a sawed-off shotgun in his hands. 697 F.2d at 263.
 
 
 124
 We recognize that these are matters of judgment and degree, about which reasonable judges may and do differ. We conclude, however, that what was said in Egan v. United States, 287 F. 958, 971 (D.C.Cir.1923), is apt here: "While there is perhaps no single instance involving error so prejudicial as to warrant reversal, we are convinced that, considered as a whole, the rights of defendant[s] were so prejudiced thereby as to deprive [them] of that fair and impartial trial which the Constitution and the law of the land accords to every citizen accused of the commission of crime." In short, our review of the entire record convinces us that the conduct of this trial fell below the Plimsoll line[4] of fairness and the appearance of fairness.[5]
 
 
 125
 Accordingly, the judgments are reversed, and these causes are remanded to the District Court for further proceedings consistent with this opinion.
 
 
 126
 LAY, Chief Judge, concurring.
 
 
 127
 Although I concurred in Judge Henley's original panel opinion, after oral argument on rehearing en banc I became convinced that prejudicial error did occur by undue intrusion into the trial proceedings by the trial court. This case is reversed because of prejudicial error occurring by reason of the trial court's comments and excessive questioning of witnesses. Although trial judges may not always agree with the manner in which trial counsel interrogate witnesses or present a case, it is fundamental that the trial judge respect the role of counsel in the adversary process. It is even more fundamental that the judge remember that he or she is not an advocate and notwithstanding the temptation to enter into the adversarial argument, that the judge exercise the utmost restraint to avoid doing so.
 
 
 128
 Perhaps this is to the disappointment of some judges, however there exists much empirical evidence justifying such a policy of restraint. At stake is the essence of a fair trial and fair judgment of the facts by a jury. Once the judge assumes the mantle of an advocate the balance of fair process becomes imbalanced and the proceeding becomes inquisitorial in kind. The fair and respected judge is one who becomes detached from the outcome and allows the chips to fall where they may. Some may disagree with this form of justice--but experience has taught us that if the adversarial system should survive--and there is none proven better--then this is the way it must be. If a trial judge cannot conform to this system, then the administration of justice will continue to require reversals by appellate courts until fair trials with fair procedures prevail.
 
 
 129
 HENLEY, Senior Circuit Judge, with whom BRIGHT and JOHN R. GIBSON, Circuit Judges, join, concurring and dissenting.
 
 
 130
 With so much of the court's opinion as adopts Parts I, III and IV of the panel opinion, United States v. Singer, 687 F.2d 1135 (8th Cir.1982), I agree. But I cannot agree that intervention in the trial by the trial judge was so egregious as to justify reversal of the judgments of conviction. In general, Part II of the panel opinion, 687 F.2d at 1140, sets forth my views on the judicial intervention aspect of the case and I shall elaborate but briefly.
 
 
 131
 Appellants mount a somewhat dichotomous attack on intervention by the trial judge. They argue that he projected himself to the jury as an advocate of the government's case and also that he was so critical of government trial counsel as to evoke sympathy for the trial attorney. The court has found facts in support of appellants' contentions and has accepted the proposed inferences to be drawn from those facts as "obvious". Yet the court's reasoning may well be flawed in that it assumes that reaction to mistreatment of the attorney will create sympathy for the attorney's client rather than resentment and reaction against the trial judge and his alleged favorite, the government.
 
 
 132
 It is to be observed also that the court, unintentionally perhaps, leaves the impression that in coming to judgment it is influenced by the fact that fifteen motions for mistrial, including one on the second day of trial, were made. See note 2, page 434, majority opinion. In a complex multi-defendant trial where each of six defendants is represented by separate counsel, it is of small consequence that fifteen motions were made in ten days. In making the first motion counsel for Singer felt that although the court's intentions may have been good in instructing, as it did, that absent witnesses could be assumed to be favorable to the defendants, the court's admonition was overstated as it applied to Singer, who is said to have been relying especially upon two missing witnesses[1] as a basis for claiming he was innocently involved in the alleged criminal activity. That motion bears no relationship to the charge that the trial judge unduly was critical of the prosecutor and little, if any, to the charge that the trial judge unduly projected himself into the trial. Indeed, later in the trial the judge again, and without objection, told the jurors they could assume certain persons not present in the court would testify for the defendants. (Tr. 426.)
 
 
 133
 More fundamentally, I disagree with the court's interpretation of the record. It is true that the trial judge intervened actively in the trial of the case. But his actions were not overly partisan and his overall conduct was not oppressive or abusive. Indeed, the atmosphere of the trial seems to have been comparatively relaxed. For example, to enliven a dull morning the judge concluded that a picture speaks "but not very loud." (Tr. 735.) At the end of the trial, in sending the jury out laughing the judge admonished the jurors about the need for unanimity and closed by saying: "Somebody's got to decide this case. You know, if you come up and you can't decide anything, then somebody else will just be doing it ... and 'Old Judge Lord' will be sitting up here giving the same instructions. So you go ahead now and do your duty."
 
 
 134
 It is, of course, impractical here to repeat at length from the transcript or to reproduce completely the atmosphere of the trial. But neither those record materials cited by the court nor anything disclosed by a full reading of the transcript persuades me that the conduct of the trial fell below the Plimsoll line of fairness or polluted the waters of justice. Cf. Mesarosh v. United States, 352 U.S. 1, 14, 77 S.Ct. 1, 8, 1 L.Ed.2d 1 (1956).
 
 
 135
 Finally, I sound a warning that as a means of reversal the court may be expanding unwisely its use of supervisory power over the administration of justice.
 
 
 136
 Concededly judges well may differ, as we do, on interpretation of the record. Yet no one on the court has found a single reversible error and no meritorious objection to the conduct of the trial was voiced until near the end of the government's case.
 
 
 137
 Here, one suspects that the reversals come because of strong disapproval of the conduct of the trial judge and without proper weight to the relevant interests involved. Cf. United States v. Hasting, --- U.S. ----, 103 S.Ct. 1974, 76 L.Ed.2d 96 (U.S.1983), in which the Supreme Court most recently had occasion to condemn reversal of convictions under the supervisory power in disregard of the rule of harmless error. While undoubtedly most, perhaps all, of the judges of this court would not approve of the manner in which the trial judge conducted this trial, or at least would have conducted it differently, and while they would send a message loud and clear cautioning against excessive intervention in trials, it is neither necessary nor wise to overturn these convictions under our supervisory power over the administration of justice in the district courts. I would affirm.
 
 
 
 [1]
 The co-defendant Scott Cline was acquitted by the jury
 
 
 [2]
 This was not the first motion for mistrial. On December 9, 1980, the second day of testimony, a motion for mistrial was made on the ground that the court had explained a certain defense contention to the jury in such a way as to minimize or belittle it. Tr. 157. In all, 15 motions for mistrial were made during the course of the trial
 
 
 [3]
 The trial judge had told the jury panel during voir dire that he had served as United States Attorney (Tr. 7)
 
 
 [4]
 See Fikes v. Alabama, 352 U.S. 191, 198, 199, 77 S.Ct. 281, 285, 285, 1 L.Ed.2d 246 (1957) (Frankfurter, J., joined by Brennan, J., concurring)
 
 
 [5]
 The dissenting opinion, citing United States v. Hasting, --- U.S. ----, 103 S.Ct. 1974, 76 L.Ed.2d 96 (U.S.1983), suggests that these convictions are being reversed "without proper weight to the relevant interests involved." Post, p. 439. We disagree. In Hasting, a court of appeals had reversed a conviction without considering whether the error it found was harmless, and the Supreme Court did not approve. Here, we have considered the trial court's conduct in the context of all the evidence presented, and we cannot say that there is no " 'reasonable possibility that the [practice] complained of might have contributed to the conviction.' " United States v. Hasting, supra, --- U.S. at ----, 103 S.Ct. at 1979, quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)
 
 
 [1]
 We are not informed on the record here as to whether those witnesses, who perhaps were criminals, have by now been apprehended or convicted