UNITED STATES of America, Plaintiff–Appellee,

v.

John William VAN DYKE, Jr., Defendant–Appellant.

No. 93–2540.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 8, 1993.

Decided Jan. 24, 1994.

Rehearing Denied March 23, 1994.

---

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of

John R. Sandre, Des Moines, IA, argued (Lawrence F. Scalise and Gary A. Robinson, on the brief), for defendant-appellant.

Judith A. Whetstine, Asst. U.S. Atty., Cedar Rapids, IA, argued (Peter J. Henning, on the brief), for plaintiff-appellee.

Before BEAM and LAY, Circuit Judges, and BOGUE,* Senior District Judge.

BOGUE, Senior District Judge.

John William Van Dyke, Jr. appeals his convictions in the United States District Court for the Northern District of Iowa. Van Dyke was found guilty of four counts of false statements to a financial institution (18 U.S.C. § 1014), three counts of bank fraud (18 U.S.C. § 1344(1)), one count of false loan documentation (18 U.S.C. § 1005), and one count of mail fraud (18 U.S.C. § 1341). He challenges: 1) the alleged prejudicial questioning and statements by the trial judge; 2) exclusion of expert testimony; 3) error by the district court in refusing to admit "exculpatory" evidence; 4) unfairness arising from the jury being read back, at their request, testimony of a key prosecution witness that was missing part of the cross-examination; 5) the district court's finding regarding more than minimal planning for sentencing purposes; 6) the restitution order made a part of his sentence; and 7) the court's admission of prior "bad acts" testimony. We reverse.

### Facts

In the early 1980's, Van Dyke became President of Toy National Bank in Sioux City, Iowa. The bank had been founded by his great grandfather, and it remained largely a family operation, both in ownership and management. The Van Dyke family also owned substantial interests in several other banks in smaller Iowa towns. Toy National

experienced some problems under Van Dyke's management, which came to the attention of government regulatory officials. In 1987, Van Dyke was removed from his positions as president and director of Toy National by the Federal Reserve System's Board of Governors. That removal was affirmed by this Court. *Van Dyke v. Board of Governors of Federal Reserve System,* 876 F.2d 1377 (8th Cir.1989). Toy National's assets were eventually sold to Norwest Bank Corporation.

In addition to his bank-related responsibilities, Van Dyke served as trustee for a family trust from June 1981 to December 1988. The trust held stock in several banks, including Toy National. In December 1988 Van Dyke was replaced as trustee by Dean Meine.

In 1992 Mr. Van Dyke was indicted, based on alleged wrongdoings that he had committed both individually and in his roles as a bank officer and trustee. The trial judge declined to rule on evidentiary motions before the issues came up at trial, and also informed counsel at the outset that he would not allow sidebar conferences.

### Analysis

We need not address each issue raised in this appeal, because we agree that Mr. Van Dyke's trial was prejudiced by several errors on the part of the district court—most notably its intervention in questioning and commenting on witness' testimony.

 "We have always been reluctant to disturb a judgment of conviction by reason of a few isolated, allegedly prejudicial comments of a trial judge, particularly in a long trial." *United States v. Leuth,* 807 F.2d 719, 727 (8th Cir.1986) (citing *United States v. Bland,* 697 F.2d 262, 265 (8th Cir.1983)). When faced with a claim that a trial judge's prejudicial comments prevented a fair trial, this court will "balance and weigh the comments of the judge against the overall fairness of the trial ... [and conclude that] the balance is adversely tipped against the defen-

---

* The Hon. Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

dant in a criminal trial where the judge's role loses its color of neutrality and tends to accentuate and emphasize the prosecution's case." *Leuth* at 727. In this case, we conclude that the district court's comments throughout the trial were sufficiently one-sided and distractive to defendant's case to deprive him of a fair trial.

We will not set forth every statement which appellant claims is improper, in part because taken in isolation most of the trial judge's comments would not justify reversal. However, it is necessary to point out some of the most colorful and damaging statements.

First, the trial judge repeatedly interrupted defendant's testimony, often taking on an impeaching air and/or bolstering the prosecution's case. Early on in defendant's testimony, while background was being laid out, the trial judge responded to an objection by saying "I sort of drifted away. What was the question?" Tr. 1915. Such a statement could have given the jury an early impression (even if incorrect) that the trial judge was not interested in what Mr. Van Dyke had to say.

Next, the district court got overly involved in questioning on behalf of the prosecutor. In the middle of defendant's direct examination, the prosecutor interrupted (not in the form of an objection) with a question about the purpose of some checks defendant had written to the family trust. The Court then got involved, as follows:

THE COURT: It seems to me that we ought to have some identification of what these checks signify.

MR. SANDRE [defense counsel]: That's what I'm trying to do, Judge.

THE COURT: Huh?

MR. SANDRE: That's what I'm trying to do.

THE COURT: Well, apparently your opponent isn't satisfied as far as you're going.

MR. SANDRE: Apparently not.

THE COURT: We started out with the first check, Heritage Trust. All right. Are you satisfied with that, now?

MS. WHETSTINE [government counsel]: Yes, Judge.

THE COURT: All right. Now, the second check that I see is a check for $10,000; is that right? Have we all agreed on that?

MS. WHETSTINE: Yes, your honor. I understand those two so far.

THE COURT: You ask the questions. I don't want to, but this is apparently what Mrs. Whetstine wants to know.

Q. (By Mr. Sandre) Is the check for $10,-000 a check made to the William Van Dyke Trust and signed by you?

A. Yes, sir.

Q. Okay. Is that a payment to the trust on your behalf? Is that a payment made—

A: I don't know if it's a loan or a loan payment. There's no way I can tell sitting here with this check or the other ones. I have no records.

Q. But it was money going from your account to the trust account?

A. Yes, sir, it is.

THE COURT: [to Ms. Whetstine] Does that satisfy you, or do you want more information?

MR. SANDRE: Judge, I'm—

THE COURT: You're offering a check into evidence.

MR. SANDRE: I haven't offered it yet. I'm trying to lay the foundation for it.

THE COURT: All right. You're not going to offer it; is that right?

MR. SANDRE: I plan to offer it, yes, sir.

THE COURT: Well, if you're reading it, counsel, and if she's not satisfied with the foundation, then you should make it.

[to Ms. Whetstine] Are you satisfied? If you're satisfied, I'm satisfied.

MS. WHETSTINE: My only concern is whether or not these checks represent loans to the trust by Mr. Van Dyke or if they are payments by him on loans he received from the trust.

MR. SANDRE: Judge, that's cross-examination.

THE COURT: Well, why don't you ask him. That's what she wants to know. Why don't you ask him.

MR. SANDRE: Can I say something, Judge?

THE COURT: Sure.

MR. SANDRE: The purpose of this exhibit is simply to show that money flowed also from Mr. Van Dyke to the trust. What it was for in any particular case is not necessarily the concern of the exhibit.

THE COURT: It is as far as your opponent is concerned. And if she objects to you reading it and offering it into evidence, I'm going to sustain the objection unless we have some knowledge of what the check purports to be, what relationship it has. Just a check floating around in the sky means nothing to your opponent or perhaps to the jury either. It doesn't mean very much to me. I don't know whether it's a loan or a payment on a loan.

Tr. 1929–32.

Later, when defendant's counsel tried to elicit whether the defendant remembered what the checks were for, the judge again interrupted as follows:

THE COURT: Well, wait a minute. Are you satisfied with the evidence as it's going in? I don't want to make objections for you.

MS. WHETSTINE: Well, no, your honor, I'm not. I will state that I have no objection to the first check No. 1051 that says loan to trust on it because it seems to appear to be a loan to the trust. I'm not satisfied unless there is some testimony regarding the purpose of the checks or something on the check itself that says what the purpose was.

Tr. 1932–33. The Court then essentially directed defendant's counsel to "skip" the checks written by defendant to the trust that he could not identify as between loans to the trust or loan payments being repaid to the trust.

It appears from this portion of the transcript that the trial judge not only got into matters that should have been left to the prosecutor on cross-examination; he also essentially "took over" on behalf of the prosecutor—very possibly giving the jury an impression that he and the prosecutor were working toward a common goal.

Later on, the defendant was attempting to explain the purpose for a loan of $82,200 from Norwest Bank to the trust which was an important part of the charges against him. Although he had no independent recollection of the purpose of the loan, he testified that based on certain documentation he had reviewed he felt he could ascertain its purpose. His version of the loan's purpose differed from that indicated by the notes of the Norwest bank officer who made the loan. The trial judge interrupted as follows:

THE COURT: Now, I'm sorry. Are you finished with your answer?

THE WITNESS: Well, I think so.

THE COURT: This is what you've conceived now as what must have been your reason; is that what you're telling us?

THE WITNESS: The reason for what, sir?

THE COURT: There was a reason marked on the bank sheet why this loan was taken out, wasn't there?

THE WITNESS: There were comments, internal comments at Norwest Bank.

THE COURT: That's right. That's right. Now, you're saying now those comments were not accurate; is that what you're saying?

THE WITNESS: That's exactly what I'm saying, sir.

THE COURT: And you're basing this on what you're thinking now in looking back on what you must have intended when that took place; is that what you're telling us?

THE WITNESS: No, sir. I'm basing this on the notes I made to myself on the renewal book.

THE COURT: Where are they?

THE WITNESS: I think they're on one of the exhibits.

MR. SANDRE: Well, that's what I was going to get to.

THE COURT: Well, if he's—What notes are you referring to?

THE WITNESS: Well, do you want me to find them?

THE COURT: Oh, absolutely.

MR. SANDRE: Look at Exhibit—Look at Exhibit N.

THE COURT: Well, wait a minute. I'll let counsel worry about this. I don't want to get too involved in this. I guess I was a lawyer myself for too long. I'll let counsel worry about it. You go right ahead.

Tr. 1946–47. This exchange is another instance of the Court's extensive involvement in matters that are ordinarily left to counsel for the government. It also tends to show incredulity on the part of the judge toward the defendant's testimony. Shortly thereafter, the Court again exhibited disbelief, saying:

THE COURT: Well, now, Mr. Van Dyke, are you speculating now? Are you testifying about something you know?

THE WITNESS: Well, I do not have the records to know that for certain.

THE COURT: Are you testifying about something you know, that's a simple question?

THE WITNESS: No.

THE COURT: All right. I'll sustain the objection and instruct the jury to disregard it. We're not going to sit here and speculate. What he knows, I'll take.

Tr. 1958. Although exclusion of this testimony might have been appropriate in itself, the trial judge's comments here reinforce what could very well have been a growing perception by the jury that he was not looking favorably at the defendant's testimony in particular or his case in general.

In *United States v. Jerde*, 841 F.2d 818 (8th Cir.1988), we summarized this Circuit's position on a trial judge's intervention as follows:

The trial court has a duty to make the interrogation of witnesses and the presentation of evidence effective for the ascertainment of truth. . . . In doing so, the trial court is permitted to interrogate witnesses, . . . particularly when it deems the questioning necessary to clarify testimony

and to elicit necessary facts. . . . The trial court's intervention should not be so extensive as to destroy the overall fairness of the trial, however. Unfairness to the defendant can result where the trial court loses its color of neutrality and tends to accentuate and emphasize the prosecution's case. . . . Although the trial court may interject isolated questions to clarify ambiguities, it cannot assume the mantle of an advocate and take over the cross-examination for the government to merely emphasize the government's proof or to question the credibility of the defendant.

*Id.* at 823 (citations omitted). In this instance, we find that the trial court did "assume the mantle" of an advocate—or at least very probably gave the jury the impression that he had done so. Viewing defendant's testimony as a whole, we find that the district court could very well have passed along a perception to the jury that he favored or felt compelled to assist the prosecutors, and that the charges were indefensible.

▇▇▇ One final aspect of the district court's intervention during defendant's testimony that warrants mention is its refusal to admit a letter written by defendant to Mr. Meine. As noted above, part of the charges against defendant involved an $82,200 loan to the family trust that was allegedly misappropriated, and a claim that he had committed mail fraud. Defendant turned over his trust documentation to Mr. Meine sometime after Meine became trustee, and as claimed discrepancies were being sorted out the two exchanged some correspondence. In the midst of a discussion of this correspondence during defendant's testimony, a letter dated March 23, 1989 from Meine to Van Dyke questioning some trust transactions was introduced. When defendant's March 31, 1989 response letter was offered, the Court initially indicated that some statements in the letter were "not relevant and in some respects . . . improper." Tr. 2057. Counsel then offered a limited excerpt from the letter, and the judge interjected:

THE COURT: No, I will not take that either, counsel. That's a plain exculpatory letter, which I—I'm just not going to accept.

MR. SANDRE: Exculpatory, Your Honor?

THE COURT: Yes.

MR. SANDRE: That's why I'm offering it, sir.

THE COURT: I know, but we're trying this lawsuit right here with the witness on the stand, counsel, not what he writes in some letter to somebody else. I'm not going to accept that.

Tr. 2059. First, evidence should not be excluded on the grounds that it is exculpatory. More importantly—assuming a hearsay objection was what the district court really had in mind—the letter should have been admitted. Mr. Meine's letter to defendant certainly tended to be inculpatory, and it seems only logical that defendant's on-the-spot response would be relevant to show what he said and/or knew at the time the correspondence was being exchanged (this also being the timeframe of some of the charged misconduct). The letter was clearly relevant; and under Fed.R.Evid. 801(d)(1)(B) it was not hearsay. Exclusion of the letter was error in itself, and it further exacerbated the damage done to the defense by the Court's intervention as noted above.

The trial court also intervened significantly during the testimony of the defense expert, Mary Curtin. At one point, when Ms. Curtin was attempting to explain federal-law limitations on a bank loaning money to its own officers/employees, she offered a gratuitous conclusion that Mr. Van Dyke had borrowed the maximum from Toy National Bank. The trial court responded as follows:

THE COURT: Well, we'll strike that, if you don't mind.

THE WITNESS: Oh, I'm sorry.

THE COURT: You're not trying this case. You know better than that.

THE WITNESS: I apologize, your honor.

THE COURT: You are a lawyer. You've been a lawyer for 20 years. Don't tell us what was right or wrong, Ms. Curtin.

The jury is instructed to disregard it.

Tr. 1884. Shortly thereafter, the prosecutor made very brief cross-examination of Ms. Curtin, then indicated he was through. The prosecutor had elicited (without objection) the fact that Ms. Curtin had worked for Mr. Van Dyke in the past, and the Court again intervened:

THE COURT: Well, if you're going to start asking about Mr. Van Dyke you're doing just what I wouldn't let Mr. Scalise do.

MR. HENNING: Your Honor, I asked—just—it was just asking if she had previously worked for Mr. Van Dyke.

THE COURT: Well, if she had worked for him?

MR. HENNING: Yes.

THE COURT: Oh, I have no objection to that. I'm sure counsel doesn't either.

Did you ever work for Mr. Van Dyke?

THE WITNESS: I answered the question, Your Honor. Yes, I did. In 1987.

THE COURT: You may pursue it.

MR. HENNING: No further questions.

THE COURT: I just have one question for my own information. . . .

Tr. 1886–87. The Court then, on its own initiative, directed Ms. Curtin to read lengthy provisions of the lending law she had been referring to. Defense counsel said nothing about the court's intervention, until the judge told Ms. Curtin to read the section about overdrafts. Defense counsel then objected:

MR. SCALISE: Excuse me, Your Honor. I have limited her to lending limit and—

THE COURT: This deals with overdrafts.

MR. SCALISE: Well, I didn't inquire into that, Judge.

THE COURT: Well, you haven't, but I have because I want to know what the law is. And I want to make sure that I'm reading it correctly.

MR. SCALISE: Well, Your Honor, with all due respect to you, I'm going to object to you inquiring into this, Your Honor, because I didn't. And I have a lot of respect for you, and you know that.

THE COURT: Oh, I know that, counsel. You're just brimming with it. I know that.

Tr. 1891–92. Defense counsel then attempted to clarify his position, to the effect that he had avoided the subject of overdrafts with

Ms. Curtin, so he thought it was improper for the judge to make her read a code section on overdrafts.

THE COURT: Counsel, there's been evidence all over this case about overdrafts, and I think the jury is entitled to know what Regulation O says about overdrafts.

MR. SCALISE: He's not charged with the crime of overdrafting.

THE COURT: He's not?

MR. SCALISE: No, he's not.

THE COURT: I thought we had an awful lot of discussion about overdrafts in the last two weeks. If I'm wrong the jury will remember what the testimony is.

MR. SCALISE: I think you're absolutely right. We have had a lot of talk about it, and the Court has said that that has come in pursuant to Rule 404(b) of the federal rules of evidence. It's not evidence of a crime. Tr. 1893–94. Ms. Curtin then obeyed the Court and read the regulation's overdraft provisions. This series of exchanges unduly emphasized the notion that overdrafts had occurred—in a context not anticipated or invited by either counsel. It also gave the jury a perception that the trial judge had general disdain and/or disbelief for the defense witness and counsel, and it is yet again another example of the district court's extensive involvement in trying the case—perceptibly as an advocate for the prosecution.

■ Closely related to the above-described treatment of Ms. Curtin, the district court essentially refused to allow her to testify as an expert. As noted above, there was substantial interplay about "Regulation O," a lengthy and detailed provision which governs (among other things) transactions wherein a bank lends money to one of its own officers. After establishing Ms. Curtin's qualifications as an expert on this regulation (both as its author and a practicing attorney dealing with it on a regular basis), counsel for defendant attempted to have her explain or clarify the significance of a provision which says that a loan which is sold to a second bank is deemed to be an extension of credit by that second bank—not the bank that originally made the loan to its own officer. Based in part on objections by counsel for the government, the district court refused to allow Ms. Curtin to give opinion or explanation of the regulation. Tr. 1872, 1877, 1878. Rather, her testimony was limited almost exclusively to word-for-word recitation of the regulation's provisions. In contrast, the government's first witness, FDIC bank examiner Mike Nelson, had been allowed to testify regarding Regulation O, how its insider loan limitations can be violated, and his opinion that defendant had committed violations. Tr. 79–84, 88–89, 105–106, 108–109, 118.

■ A trial court's decision to exclude expert testimony is accorded broad discretion, and will be upheld unless it is manifestly erroneous. *United States v. Kandiel,* 865 F.2d 967, 971 (8th Cir.1989). Under the circumstances, we conclude that the district court's refusal to allow Ms. Curtin to give expert opinion was reversible error. It is well settled that an expert may express an opinion even if it embraces an ultimate issue to be decided by the fact finder. *United States v. Battle,* 859 F.2d 56, 58 (8th Cir. 1988); Fed.R.Evid. 704(a). Here, we are convinced that elaboration by Ms. Curtin would clearly have assisted the jury in understanding the regulation and defendant's reasons for asserting that he had not violated its provisions. This would have especially been appropriate and fair given Mr. Nelson's prior unequivocal assertion that defendant had violated Regulation O and other laws. The district court's limitation of the scope of Ms. Curtin's testimony is particularly troubling in light of his subsequent treatment of her, as noted above. This combination in all likelihood rendered her testimony meaningless to the jury at best—or perhaps even more prosecutorial than defense-oriented.

To summarize regarding the district court's intervention during the trial, we recognize the propriety, and what oftentimes becomes necessity, of a trial judge's intervention in order to assist itself and the jury in their understanding of the case on trial. *See generally Jerde,* 841 F.2d at 823; Fed. R.Evid. 614(b). Such intervention may especially be necessary where, as here, a defendant is charged with multiple counts involving complex legal and factual issues. Howev-

er, we find that, viewed as a whole, the record reflects excessive interplay between the district court and witnesses, consistently giving rise to a perception that the judge favored the prosecution's case. In other words, based on the record we cannot help but conclude that the conduct of the trial judge probably so impressed the jury with his partiality to the prosecution that this became a factor in determining defendant's guilt.[1]

Another aspect of the trial which detracted from the jury's consideration of this matter was the district court's handling of jury instructions and jury questions. The Court apprised the parties orally as to some, but not all, of the instructions that would be given. These instructions were not reduced to writing, either for the benefit of counsel in making objections/suggestions or the jury in conducting their deliberations. Shortly after the jury started deliberating they requested a copy of the indictment. The Court sent it in—over defendant's objection that it would overemphasize the government's case. Again, the Court did not send written instructions into the jury room.

Later, the jury requested the language of 18 U.S.C. § 1005, and the district court gave it to them—again over defendant's objection that written instructions would be more understandable to the jurors. Shortly thereafter, the jury requested twelve written copies of the instructions. The Court initially refused to make the court reporter retype the instructions, but then said he would allow it after counsel for the government said they had no objection. There is no indication that the instructions were ever given to the jury, apparently because they reached a verdict before the court reporter finished transcribing them.

We recognize that the decision on whether to give the jury a written copy of the court's instructions is within a trial judge's sound discretion. *United States v. Conley*, 503 F.2d 520, 522 (8th Cir.1974). However, in *Conley* we noted that the trial lasted less than two days and the issues were not complicated. This stands in stark contrast to the present case—where trial lasted over two weeks and pertained to a complex series of transactions and a multiple count indictment. In this context we find that the district court abused its discretion by not making written instructions available either to counsel or the jury. This is so particularly because a copy of the indictment was given to the jury. Although there is ordinarily no error in giving the jury a copy of an indictment, in the complex context of this case we agree with appellant that the indictment, as the government's formal charging document, gave the jury a one-sided view of the case—especially in light of the fact that they did not have a set of neutral written jury instructions to guide them in their deliberations.

In addition to the above requests by the jury, they asked to have the testimony of Dean Meine, who replaced Mr. Van Dyke as trustee of the family trust, read back to them. This testimony was particularly damaging because of its reference to $82,200 that Van Dyke had ostensibly borrowed on behalf of the trust to buy stock for the trust which ended up unaccounted for. Apparently through inadvertence, the first thirteen pages of defense counsel's cross-examination of Mr. Meine was not read back. During this testimony, the defense made substantial progress towards explaining what had happened to the money—or more specifically, that the $82,200 was never taken from the trust.

---

1. Appellee repeatedly asserts in its brief that defendant failed to preserve the record pertaining to much of the trial judge's intervention by objecting to such inquiry, so those instances without defense objection ought to be subject only to limited Fed.R.Crim.P. 52(b) "plain error" analysis. Although we agree that there were few objections to the colloquy and interruptions of the trial judge, we find that a perception of unfairness to defendant pervades the entire record. This is so particularly in light of 1) the fact that the objections would relate to the judge's actions, not just those of an adverse party (*see, e.g. United States v. Gunter*, 631 F.2d 583, 587 (8th Cir.1980)); and 2) the court's refusal to allow side-bar conferences—which forced counsel to air most of their grievances in front of the jury. It would be understandable that defense counsel would feel compelled under the circumstances to minimize the ever-growing perception of tension between themselves and the judge. In any event, we consider the court's excessive intervention and lack of neutrality as plain error which deprived defendant of a fair trial.

■ We review a court's decision to read only portions of a witness's testimony on an abuse of discretion standard. *United States v. Haren,* 952 F.2d 190, 197 (8th Cir.1991). We do not find an abuse of discretion here, because it was apparently the district court's intention to have the entire cross examination read to the jury. However, the inadvertent failure to include this rather exculpatory portion of cross examination—especially in combination with the other problems noted above—certainly tended to give the jury a version of events singularly favorable to the prosecution.

To summarize, as this Court stated in *United States v. Singer,* 710 F.2d 431 (8th Cir.1983), "while there is perhaps no single instance involving error so prejudicial as to warrant reversal, we are convinced that, considered as a whole, the rights of defendant were so prejudiced thereby as to deprive [him] of that fair and impartial trial which the Constitution and the law of the land accords to every citizen accused of the commission of crime." *Id.* at 437 (citation omitted). As was the case in *Singer,* our review of the entire record in this matter convinces us that the conduct of Mr. Van Dyke's trial fell below established standards of fairness. Accordingly, the judgment of conviction is reversed and the matter remanded to the District Court.