**UNITED STATES of America, Plaintiff,**

v.

**Yamil H. KOURI–PEREZ (01), et al., Defendants.**

**No. Crim. 97–091(JAF).**

United States District Court, D. Puerto Rico.

April 22, 1999.

Maria A. Dominguez–Victoriano, Asst. U.S. Attorney, Edna Rosario, Asst. U.S. Attorney, Guillermo Gil, U.S. Attorney, San Juan, PR, for plaintiff.

Benny Frankie Cerezo, Charles W. Daniels, San Juan, PR, for Kouri–Perez, defendant.

Francisco Rebollo–Casalduc, San Juan, PR, for Sotomayor–Vazquez, defendant.

Yolanda Collazo, San Juan, PR, for Borel–Barreiro, defendant.

## OPINION AND ORDER

FUSTE, District Judge.

Defendants Yamil H. Kourí–Pérez ("Kourí"), Jeannette Sotomayor–Vázquez ("Sotomayor"), and Armando Borel–Barreiro ("Borel"), move for reconsideration of the denial of their motion for a mistrial in this trial.

## I.

On March 25, 1999, Dr. Jaime Rivera–Dueño, the former Executive Director of ACHS, was on the witness stand. Previous witnesses had characterized Defendant Kourí as a domineering, authoritative, and iron-handed person. Within this backdrop, defense counsel Cerezo asked the witness whether he found Defendant Kourí to be "as persuasive, forceful as Carlos Romero–Barceló," the ex-Governor of Puerto Rico and present Resident Commissioner. *Tr.* at 46. The prosecution objected to the comparison, and we ruled that counsel may not compare the Defendant to Puerto Rico political figures.[1]

Defendants moved for a mistrial alleging that our comments had unfairly prejudiced Defendants. On April 7, 1999, in Order Number 62, we denied Defendants' motion for a mistrial. *Docket Document No. 725.* We found that our comments in no way prejudiced Defendants. Defendants now move for reconsideration of Order Number 62 or, in the alternative, a curative instruction.

Defendants' motion, in its barest form, asserts that our comments were so prejudicial and partial so as to eviscerate Defendants' Sixth Amendment right to a fair trial. Defendants maintain that our comments have infected the jury with the sentiment that Defendant Kourí is guilty and, thus, emasculated any notion of a fair trial for Defendants. Defendants contend that our earlier disposition of this matter grossly mischaracterizes the situation and results in a fundamental injustice and an assault upon Defendants' constitutional rights.

Although we addressed these concerns in Order Number 62, we shall once again explore this matter in the hopes of extinguishing the issue.

## II.

We unreservedly agree with Defendants' assertions that a paramount duty of the trial court is to ensure each Defendant's right to a fair and impartial trial in accordance with the Sixth Amendment. In the specter of Defendants' Sixth Amendment rights, we reexamine what occurred in its proper context. We note that courts review trial-court interlocutory decisions by looking to the record as a whole. *United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986) (stating that "a finding of partiality should be reached only 'from an abiding impression left from a reading of the entire record, and need not be reached on the basis of a few improper comments' ") (internal citations omitted); *United States v. Filani,* 74 F.3d 378, 385 (2d Cir.1996). Federal district judges are "not relegated to complete silence and inaction during the course of a criminal jury trial." *United States v. Musgrave,* 444 F.2d 755 (5th Cir.1971); *United States v. Marzano,* 149 F.2d 923, 925 (2d Cir.1945) (L.Hand, J.) (noting that trial judge's duty to ensure the proper administration of the law would be perniciously impaired if the judge were to remain inert). The incident occurred in the context of cross-examination, and we must repeat that: "In order to establish that the trial judge abused his discretion in limiting cross-examination, the defendant must show that the restrictions imposed [or suggestions made] were clearly prejudicial." *Twomey,* 806 F.2d at 1140 (citing *Harris v. United States,* 367 F.2d 633, 636 (1st Cir.1966)).

---

1. The transcript provides:

    MR. CEREZO: Would you say that [Defendant Kourí is] as persuasive, forceful as Carlos Romero–Barceló?
    MS. DOMINGUEZ: I object to the comparisons.
    THE COURT: I am not allowing comparisons to political figures.
    MR. CEREZO: I am trying to assist him to convey—

    THE COURT: Then compare him to any other person, to Khadafy, Hitler, Winston Churchill, Clinton ... Bill Clinton if you will, anybody, but not a Puerto Rican political figure.

    As corrected per Order No. 62.

In this case, defense counsel Cerezo was cross-examining Dr. Jaime Rivera–Dueño, a former Secretary of Health under Governor Carlos Romero–Barceló, concerning his impression of Defendant Kourí. Mr. Cerezo attempted to make a comparison between Defendant Kourí and Carlos Romero–Barceló, the present Resident Commissioner and former Governor of Puerto Rico. The prosecution objected. We ruled that there would be no comparison to political figures and Mr. Cerezo insistently pushed his point. Then, we informed counsel that we would not allow reference to be made to Puerto Rico political figures. We understood that the comparison to Governor Romero–Barceló was unnecessary, polarizing, and extreme. During the course of this exchange, we then suggested other extreme examples, ranging from Khadafy and Hitler to Churchill and Clinton as figures that could be used for comparison purposes if counsel so wished. The purpose was to direct attention away from Puerto Rico political figures in a criminal trial where the charges include diversion of federal monies as contributions to the local political campaigns of Puerto Rico politicians. The use of political figures for comparison purposes could subliminally polarize the jury or distract their attention from the facts of the case.

Carlos Romero–Barceló is a particularly-polarizing political figure in modern Puerto Rico society. Mr. Romero–Barceló was Governor during the 1978 Cerro Maravilla incident which attracted Puerto Rico's attention for years to come. Stripped to its bare essence, the Cerro Maravilla incident involved Puerto Rico police officers who shot and killed two members of the Puerto Rico independence movement on July 25, 1978, a holiday dedicated to celebrate the present political relation between the government of Puerto Rico and the federal government. Due to the politically-divisive effect this had on society, the Puerto Rico Senate held protracted hearings in which Mr. Romero–Barceló was smeared with ordering and covering the executions as governor and president of his political party, the New Progressive Party. The First Circuit described the atmosphere as such:

> [T]his case involves a publicity issue of unusual seriousness, presenting as it did charges of cold-blooded murder and police corruption that became causes celebres throughout Puerto Rico.

*United States v. Moreno Morales*, 815 F.2d 725, 734 (1st Cir.1987). No formal charges ever materialized, but the impact on society was substantial, virtually splitting society evenly on whether Governor Romero–Barceló was or was not involved in the killings and an alleged subsequent coverup. To many, Mr. Romero–Barceló was the penultimate hero, because he represented a figure of extreme strength and fortitude in the face of unfair politically-motivated accusations. These citizens had no doubt in Mr. Romero–Barceló's innocence. On the other side of the spectrum were those convinced that Mr. Romero–Barceló was evil incarnate. They viewed him as a political criminal, ultimately responsible for the deaths and the subsequent alleged coverup. The Cerro Maravilla incident remained alive for years to come. Renewed rounds of accusations were periodically begun. Prior to both the 1984 and 1992 elections, the Puerto Rico Senate, controlled by Mr. Romero–Barceló's political opponents, began a renewed series of hearings focusing on Mr. Romero–Barceló's possible involvement and culpability for the incidents at Cerro Maravilla. This investigation stirred up the described feelings and reignited the previous raging emotions.

Given the historical background, it is no stretch of the imagination to see how potentially volatile and improper reference to Mr. Romero–Barceló could be. It was evident that Mr. Cerezo was trying to play the trump card and arouse these emotions before the jury, and this court wished to avoid the inevitable onslaught of sentiments which the figure of Mr. Romero–

Barceló evokes to some in Puerto Rico and that must be present in the empaneled jury. At this point, our equally-forceful suggestion of a range of appropriate comparisons was made—compare him to Khadafy, Hitler, Winston Churchill or Bill Clinton. Any unbiased observer will agree that our remarks were made to diffuse what we perceived to be a potentially-explosive comparison. In no way was "the cloak of impartiality which a judge should wear" impaired. *Baker v. United States,* 357 F.2d 11, 14 (5th Cir.1966). In no way, form or fashion did we compare Dr. Kourí to any of these forceful figures.

We also note that when we made our ruling concerning the comparison, defense counsel made no timely objection. Fed. R.Evid. 103(a)(1). Defendants filed their motion on March 30, 1999, five full days and three court days after our ruling. This written motion concerned the comment that has generated such commotion, which was "[t]hen compare him to any other person, to Khadafy, Hitler, Winston Churchill, Clinton ... Bill Clinton if you will, anybody, but not a Puerto Rican political figure." In this case, we were on trial, in the middle of a heated exchange, seeking the truth and diffusing the unnecessary and ill-motivated reference to Mr. Carlos Romero–Barceló. We offered an array of domineering and authoritative world figures, the first ones to come to our mind as iron-handed, persuasive or determined leaders. We were not comparing Defendant Kourí to any of these figures. We were instructing defense counsel on the proper scope of questioning. While it certainly would have been better had we prepared, in advance, a list of more palatable figures, that was not the situation. We made an instant decision and stand behind the interests we were protecting when the statement was made.

Defendants' main argument remains unchanged from their previous motion: Our mention of Hitler and Khadafy, along with Winston Churchill and Bill Clinton, has poisoned the jury to such an extent that a mistrial is necessary to cure the evil. The motion goes on to attack our earlier order. In particular, Defendants challenge our labeling of Hitler and Khadafy as symbols of entrepreneurialism. We find Defendants' criticism to be misplaced. An entrepreneur is one that organizes, promotes, or manages an enterprise or activity of any kind. WEBSTER'S THIRD INTERNATIONAL DICTIONARY 759 (3rd ed.1981). Clearly, Hitler, Khadafy, Churchill, and Clinton qualify as entrepreneurs. Additionally, Defendants assail our characterizations and suggest that we are undermining the reality and severity of the situation by naming the figures. Again, we recognize the negative inferences that could be drawn by a comparison to either Hitler or Khadafy. However, we were making no such comparison. Our suggestions, using the objective-person standard, fall far short of grossly prejudicing Defendants. *See, e.g., United States v. Twomey,* 806 F.2d 1136, 1140 (1st Cir.1986) (stating that "[a] finding of partiality should be reached only 'from an abiding impression left from a reading of the entire record' ") (internal citation omitted); *United States v. Singer,* 710 F.2d 431, 436 (8th Cir.1983) (quoting *United States v. Porter,* 441 F.2d 1204 (8th Cir. 1971) (stating that "[a] few improper comments are not necessarily enough to require reversal")).

Defendants also contend that our statement indicated to the jury that we believed Defendant Kourí to be guilty, thus mandating a mistrial. We believe the record speaks for itself on this point. We in no way indicated or expressed an opinion on the guilt or innocence of Defendant Kourí. Furthermore, our comment was directed not to Defendant Kourí, but to his defense counsel. *See United States v. Donato,* 99 F.3d 426, 437–38 (D.C.Cir.1996) (noting the difference between statements directed to defense counsel, which are generally not prejudicial, and statements directed to defendants, which are more likely to be prejudicial).

The cases Defendants cite are different in kind and nature than what occurred here. For example, in *Scott v. Ohio*, 480 U.S. 923, 107 S.Ct. 1386, 94 L.Ed.2d 699 (1987), a defendant was convicted and sentenced to death by a jury to whom the judge had stated that, on the basis of news accounts he had read, he believed defendant was a participant in the crime. The Court found that with this statement, "the judge had effectively become a witness against [defendant]." *Id.* at 924, 107 S.Ct. 1386. Moreover, in *Baker v. United States*, 357 F.2d 11 (5th Cir.1966), the court scarcely touched upon the possibility of prejudice at trial as it found reversible error on other grounds and was reversing and remanding the case for a new trial. Neither of these cases represents our situation.

Defendants seem to allege that the very fact that the statement was made by a judge essentially mandates a mistrial. We do not dispute the fact that the judge is the most influential figure in a courtroom. For this very reason, a judge's impartiality is paramount in any trial. Nonetheless, our views sharply diverge from Defendants beyond these points. We fail to see how proffering a series of names of forceful leaders "makes [it] plain that the Court does not find Defendant a credible character." *Docket Document No. 741.* Furthermore, we in no way can discern how our statement gives the powerful impression that the district court agreed with the government that the defendant was a bad character guilty of the white-collar crimes charged. This case is not about murders or crimes of violence. It is all about fraud and money. We sincerely believe that Defendants are misconstruing both the content and the meaning of the statement. The issue would, for all intents and purposes, be dead and buried in the jury's mind but for Defendants' insistent revival of it.

Finally, Defendants assert that the intent of the trial judge is irrelevant in determining whether a mistrial is warranted. Thus, they contend that regardless of our purposes, the remark was so prejudicial as to demand a mistrial. We also find this argument to be without merit and based upon faulty logic. We have already determined that, irrespective of our intent, the reality of the statement did not wreak extreme prejudice upon the heads of Defendants. Thus, we are not making a determination of the intent behind a severely-prejudicial statement. We have found that the statement is not severely prejudicial, regardless of our intent in making it.

In the alternative, Defendants request a curative instruction to dissipate any negative effects on the jury's mind. Many courts have found that curative instructions sufficiently abrogate any potential prejudice from a judge's questions or comments during trial. *See United States v. Nueva*, 979 F.2d 880, 885 (1st Cir.1992) (citing *United States v. Quesada–Bonilla*, 952 F.2d 597, 601 (1st Cir.1991)); *see also United States v. Sepulveda*, 15 F.3d 1161, 1184 (1st Cir.1993) (stating that "[within wide margins, the potential for prejudice stemming from improper testimony . . . can be satisfactorily dispelled by appropriate curative instructions]"); *United States v. Nashawaty*, 571 F.2d 71, 76 (1st Cir. 1978).

In our continuing effort to ensure the impartiality of the trial, we will consider giving a curative instruction. To that effect, we request defense counsel to submit a proposed instruction to this court for our consideration, indicating whether the same should be given at the end of the case as part of the general charge or at some other point during this ongoing trial.

### III.

We **DENY** Defendants' motion for reconsideration of Order Number 62 and **OFFER** relief consistent with this opinion.

**IT IS SO ORDERED.**